## L. H. BALDWIN ET AL. V. M. GOLDFRANK ET AL.

### No. 192.

**1. Search for Lost Deed.**
See evidence held to show sufficient search for a lost deed to admit secondary
evidence to its execution and contents.................................... 256

**2. Absence of Power of Attorney—Presumption.**
A deed was in evidence which purports to have been executed by virtue of a
power of attorney, and which is forty years old; but under it no claim ap-
pears to have been asserted for a quarter of a century. The power of at-
torney was not produced. The presumption from these facts would seem to
be not that the power did in fact exist, but rather that it did not exist, or
that for some other reason not disclosed no title passed by the deed....... 258

**3. Execution of Power of Attorney—Names of Parties.**
A deed purporting to have been executed under a power of attorney from
heirs of a party named, but whose names appear neither in the body nor in
the signatures to the instrument, is incompetent as a conveyance......... 258

**4. Recitals.**
Recitals in a deed of date August 19, 1850, that the grantor was of the Re-
public of Mexico, do not prove that he was a Mexican citizen at date of
treaty of Guadalupe Hidalgo, ratified in 1848 .......... .............. 259

**5. Rights of Mexicans Under Treaty of Guadalupe Hidalgo.**
The provision of section 8 of the treaty of Guadalupe Hidalgo simply secures
Mexicans in their rights of property, and guarantees them in that respect
the same protection which is extended to citizens of the United States.... 259

**6. Provisions of Act of 1850.**
The Act of February 8, 1850, provided for the appointment of a board of land
commissioners to investigate and report upon the titles to lands in certain
counties. The act prescribed: "No sale by any claimant of land under
the provisions of this act shall take place until after a title to the same shall
have been confirmed to the original claimants, but all such sales of lands
or claims to lands shall be void." This act did not discriminate against
Mexican claimants, or compel the submission of any claim to the jurisdic-
tion of the board. It extended privileges, not burdens, and was therefore
not in conflict with the treaty. The inhibition against selling was a legiti-
mate exercise of legislative power, and was valid.................... ... 260

**7. Fees.**
The imposition of fees in said act was not a tax; but if it was, and illegal,
the defect would not invalidate other parts of the act ........... ....... 260

**8. Transfer of Lands Submitted to Said Land Board.**
A sale of land submitted to the said land board between its creation and the
date of patent of land under title approved by the board, is void under
said act ...................................................... 261

**9. Trespass to Try Title Against Tenant in Common.**
In an action of trespass to try title against a tenant in common, it devolves
upon the plaintiff to allege "the amount of the interest claimed by him."
And although he may recover a less interest, still the plaintiff must prove
some definite interest. He can not recover upon evidence of ownership in
some undivided portion of the land ................................. 261

ERROR to Court of Civil Appeals for Fourth District, in an ap-
peal from Bexar County. Chief Justice James, having been of coun-
sel, did not sit in the case in the Court of Civil Appeals.

The opinion gives a sufficient statement.

*Fleming, Camp & Camp* and *James Raley*, for plaintiffs in error.

1. The evidence showed diligent search for the deed to Cazneau for half the Rivas grant, and secondary evidence of the contents should have been allowed. Parks v. Caudle, 58 Texas, 216; Bounds v. Little, 75 Texas, 316; Clapp v. Engledow, 82 Texas, 290; Trimble v. Edwards, 19 S. W. Rep., 773; Dunn v. Choate, 4 Texas, 14; Vandergriff v. Pearcy, 59 Texas, 371.

2. A deed more than thirty years of age is admissible in evidence without proof of its execution, if shown to come from a proper custody. This is the rule where the original instrument is produced. If the original is not found, and its contents are sought to be established by secondary evidence, it has been held to be necessary to prove the execution of the original, as well as its contents. Ammons v. Dwyer, 78 Texas, 649, 650; Schunior v. Russell, 18 S. W. Rep., 489; Bounds v. Little, 75 Texas, 316; Crain v. Huntington, 81 Texas, 615; Dohony v. Womack, 19 S. W. Rep., 883; Parker v. Chancellor, 11 S. W. Rep., 503.

3. Where a deed is established by the rules of evidence, and such deed is ancient in character, the power under which it purports to have been executed will be presumed, and the better opinion is, that title need not have been asserted under the deed. Johnson v. Timmons, 50 Texas, 521; Garner v. Lasker, 71 Texas, 436; Harrison v. McMurray, 71 Texas, 128; Veramendi v. Hutchins, 56 Texas, 414; Jobe v. Ollre, 80 Texas, 187; O'Donnell v. Johns, 13 S. W. Rep., 376; Hensel v. Kegans, 79 Texas, 349; Tucker v. Murphy, 66 Texas, 355; Stockbridge v. Stockbridge, 14 Mass., 257.

4. To admit secondary testimony to establish the execution and contents of a lost writing, the loss of the original must be shown, and it must be made to appear that diligent search has been made for the same, without effect, in the places where the same was most likely to be found. Upon the fulfillment of this rule, secondary evidence of the execution of the writing and of its terms is allowed. Parks v. Caudle, 58 Texas, 216; Bounds v. Little, 75 Texas, 316; Clapp v. Engledow, 82 Texas, 290; Trimble v. Edwards, 19 S. W. Rep., 773; Dunn v. Choate, 4 Texas, 14; Vandergriff v. Pearcy, 59 Texas, 371.

5. A deed or contract executed under a power will be enforced in a court of equity, notwithstanding the names of the principals may not be disclosed. Giddens v. Byers' Heirs, 12 Texas, 81; Rogers v. Bracken, 15 Texas, 566, 567; Rogers' Admr. v. Frost's Admr., 14 Texas, 268; Daughtrey v. Knolle, 44 Texas, 453; Hough v. Hill, 47 Texas, 153 (approved in 72 Texas, 595); Faulk v. Dashiell, 62 Texas, 647; Lumber Co. v. Pinckard, 4 Texas Civ. App., 671; Norris v. Harris, 15 Cal., 226; 2 Perry on Trusts, 3 ed., sec. 511c; Allison v. Curtis, 2 Watts, 189; Robbins v. Bellas, 4 Watts, 256.

6. Where a deed is ancient in character, the power under which it purports to have been executed will be presumed. Johnson v. Tim-

mons, 50 Texas, 521; Garner v. Lasker, 71 Texas, 431; 16 Texas, 513; Harrison v. McMurray, 71 Texas, 128; Veramendi v. Hutchins, 56 Texas, 450; O'Donnell v. Johns, 13 S. W. Rep., 376; Hansell v. Kegans, 79 Texas, 349; Ruby v. Van Valkenburg, 10 S. W. Rep., 514; Tucker v. Murphy, 66 Texas, 355.

7. The deed from Garza to Cazneau, dated August 19, 1850, being legal and valid upon its face and its execution fully proven, it should have been admitted in evidence by the court, notwithstanding the law of the 8th of February, 1850. The State v. Sais, 47 Texas, 307; Trevino v. Fernandez, 13 Texas, 630; Treaty of Guadalupe Hidalgo, part 1, Charters and Constitutions of the United States, p. 188; Ferris v. Coover, 10 Cal., 619; Waterman v. Smith, 13 Cal., 392; 12 Pet., 436; U. S. Const., art. 6; sec. 2.

Appellants contend, that the Act of February 8, 1850, is null and void, because in conflict with the treaty of Guadalupe Hidalgo, which guaranteed to Mexicans protection to their property rights, and because said law interferes with and attempts to take away such property rights.

8. The court erred in holding that the State of Texas had jurisdiction over the country lying between the western margin of the Nueces River and the eastern margin of the Rio Grande at the time said Act of the Texas Legislature of the 8th of February, 1850, was passed, the land in this suit being situated within such territory, and said territory not having been ceded to the United States until the treaty of Guadalupe Hidalgo, of February 2, 1848, and not having been ceded by the United States to the State of Texas until the 25th of November, 1850, which was after the passage of the Act of February 8, 1850, and after the date of said deed of August 19, 1850. A State has no authority or power to legislate in regard to territory over which the State has not actual and exclusive control.

*Upson & Bergstrom* and *Denman & Franklin,* for defendants in error.

1. It is not admitted that this suit was brought by the representatives of William L. Cazneau, or that the Rivas grant had been in the previous century granted to Antonio Rivas by a perfect and complete title; but appellees contend the same required confirmation under an Act of the Legislature of the State of Texas, entitled "An act to provide for the investigation of land titles in certain counties therein mentioned," which was passed and took effect February 8, 1850. Pasch. Ann. Dig., arts. 4440–4455, pp. 732–735; Acts of Leg., vol. 12, p. 144. Appellees admit that said Rivas grant was embraced and confirmed by the Act of the Legislature of Texas of February 10, 1852, which took effect April 17, 1852, entitled "An act to relinquish the right of the State of Texas to certain lands therein named." Pasch. Dig., art. 4461, pp. 734–737. Appellees further contest appellants' statement that the admission of either of the deeds, the ruling out of which is complained of by appellants, would have shown in the plaint-

iff Cora Hutchings, in connection with the testimony that was admitted by the court, a superior title to that of the defendants by common source.

2. The State of Texas having and exercising jurisdiction over the territory, embracing among other lands the Rivas grant in controversy in this case, before and at the time of the deed of August 19, 1850, had the right through its Legislature to pass and enforce the Act of February 8, 1850, authorizing the Governor of Texas to appoint a board of commissioners to review and examine all titles and claims to lands lying within such territory which emanated from the government; and having and exercising jurisdiction over such territory prior to the 2nd day of March, 1836, when Texas became an independent Republic, claimed the territory in question bounded on the west by the Rio Grande; and had the further right in said act to prohibit and declare void the sale by any claimant of lands thereunder until after a title to same had been confirmed to the original claimant or claimants.

3. The treaty of Guadalupe Hidalgo in effect recognized the claim of Texas to, and its jurisdiction over, the territory in question, and did not undertake to cede the same to the United States, but simply determined and fixed the Rio Grande from its mouth to the southern boundary of New Mexico as the boundary line between the two Republics, so far as the same relates to Texas.

By the Act of Congress of Texas, of December 19, 1836, the Rio Grande, from its mouth to the forty-second degree of north latitude, was claimed and defined as the western boundary of the Republic of Texas.

Bexar County, in which the Rivas grant was formerly situated, was represented as a county in the first Congress of the Republic, and her boundaries defined May 24, 1838. Kinney County, in which the Rivas grant was situated, was created out of Bexar County, January 28, 1850. The grant is now in Maverick County. 1 Sayles' Early Laws of Texas, pp. 585–603.

By the treaty of Guadalupe Hidalgo, the boundary line between Mexico and Texas was the Rio Grande, from its mouth to where said river strikes the southern boundary of New Mexico. By the treaty between the United States and Mexico, of December 30, 1853, the Rio Grande, from its mouth to where the parallel of 31° 47′ north latitude crosses said river, was established as the boundary line. Mexico never ceded the territory in question to the United States, nor did the United States ever cede it to Texas. Texas acquired it by right of conquest when her independence as a Republic was established, in 1836.

By the joint resolution of the Legislature of the State of Texas, of February 11, 1850, the boundaries of the State of Texas, which included the land in question in this suit, were defined, and it was thereby declared, that all territory lying within such boundaries belonged to the State of Texas, and was included within her rightful civil and political jurisdiction.

Texas was admitted into the Union December 29, 1845. Until the organization of the State government, February 16, 1846, the government and laws of the Republic of Texas continued in force.

The county of Nueces, lying between the Nueces River and Rio Grande, a part of the territory appellants claim, was ceded to the United States by Mexico, February 2, 1848, and by the United States to Texas, November 5, 1850. In 1846 it was organized, and in the fall of that year State courts were held, and regularly thereafter, at Corpus Christi, the county seat. Trevino v. Fernandez, 13 Texas, 650.

In 1848, Cameron County, lying on the east bank of the Rio Grande, was organized, and the same year and regularly thereafter courts were held under the laws of Texas.

Similar laws to the Act of February 8, 1850, before referred to, for the investigation of land titles within the territory in question, were passed by the Legislature of Texas, February 11, 1854, and August 15, 1870. Pasch. Ann. Dig., arts. 469, 4481, et seq.; and all these laws were regarded as valid by our Supreme Court, in various cases hereafter cited. Soon after the annexation of Texas, December 29, 1845, armed occupation of this disputed territory was taken by the United States on behalf of Texas, since which time Texas has exercised undisputed jurisdiction over it.

February 10, 1852, the Texas Legislature passed an act confirming certain land titles, among them the Rivas grant. Pasch. Ann. Dig., pp. 46, 192, 734–737; 1 Sayles' Early Laws, 575, 576; Treaty of Guadalupe Hidalgo, 1848; 9 U. S. Stats., p. 926, art. 5; 2 Sayles' Civ. Stats., arts. 297, 3794; Pasch. Ann. Dig., art. 443; Trevino v. Fernandez, 13 Texas, 649, 650; The State v. Sais, 47 Texas, 309–311, 314; The State v. Cardinas, 47 Texas, 281; The State v. Cuellar, 47 Texas, 302–304; Clark v. Hill, 67 Texas, 145; Calkin v. Cocke, 14 How., 227; Pasch. Ann. Dig., arts. 4440–4456; Act Feb. 10, 1852; 2 Pasch. Ann. Dig., art. 4461; Heirs of Hunt v. Heirs of Robinson, 1 Texas, 448; Brown v. Simpson, 67 Texas, 225; Tied. Lim. Pol. Powers, sec. 119.

4. A deed to be effective must not only be signed by the grantor, but must be delivered; and to be admissible in evidence, if unrecorded, its execution must be proven by the best evidence, or that of a subscribing witness, unless the witness is shown to be dead; then by proving the handwriting of the witness. 1 Dev. on Deeds, sec. 260; 1 Greenl. on Ev., secs. 82–84, and note 2; Id., secs. 569, 572, 579; White v. Holliday, 20 Texas, 682; Frazier v. Moore, 11 Texas, 755; Sample v. Irvin, 45 Texas, 567; Craddock v. Merril, 2 Texas, 494; Hollins v. Dashiell, 52 Texas, 199; Barber v. Terrell, 54 Ga., 146.

There is no evidence that Cazneau ever acted upon or claimed under this deed; nor does it appear that any one ever acted upon or claimed under it until the filing of the original petition in this cause, December 9, 1889, over thirty-nine years after the date of the deed. There is no evidence that Cazneau or Garza, or any one claiming under either or both of them, ever had possession of or paid taxes on this land.

To entitle a deed to admission without proper proof of its execution and genuineness as an ancient instrument, it must be free from suspicion, and shown to come from the proper custody, or have been acted upon so as to afford some corroborative proof of its genuineness. Stroud v. Springfield, 28 Texas, 663; Ammons v. Dwyer, 78 Texas, 650, 651; 1 Greenl. on Ev., secs. 557–570; Garner v. Lasker, 71 Texas, 431; Holmes v. Coryell, 58 Texas, 685–690; Schunior v. Russell, 83 Texas, 95, 96; Bounds v. Little, 75 Texas, 321.

5. The supposed deed of July 12, 1852, not having been produced; its execution or delivery not having been shown; its contents not having been proven; not having been shown to come from the proper custody and to be free from suspicion; not having been acted upon or any claim set up under it until a few months before the trial of this case, quite forty years after the date of the deed; and not having been shown to have been lost and proper search made therefor; and it not appearing, by affidavit or otherwise, if any such deed existed, that it was not in the custody or under the control of, or could not be produced by the plaintiff, and the power of attorney therein mentioned not having been produced, or its execution proven or attempted to be shown, was properly excluded by the court. Tucker v. Murphy, 66 Texas, 359, 360; Johnson v. Shaw, 41 Texas, 430; Watrous v. McGrew, 16 Texas, 513; 4 Phil. on Ev., 812, note h; Fairly's Admr. v. Fairly, 38 Mass., 280–290; Wilson v. Simpson, 80 Texas, 283.

"The stringency of the rule requiring search for documents and proof of their loss to admit evidence of their contents is proportioned to their character and value." Ins. Co. v. Rosenagle, 77 Pa. St., 507.

6. As the alleged lost deed in question would not be evidence of an ancient instrument without proof of its execution and contents, the power under which appellants claim Garza acted in its execution would not be presumed without such proof. Garner v. Lasker, 71 Texas, 435; Lessees of Clarke v. Courtney, 5 Pet., 344; Brown v. Simpson, 67 Texas, 325; 1 Whart. on Ev., sec. 142; Winn v. Patterson, 9 Pet., 674.

7. If an attorney has authority to convey lands, he must do it in the name of the principal. The conveyance must be the act of the principal, and not of the attorney; otherwise the conveyance is void. And it is not enough for the attorney in the form of the conveyance to declare that he does it as attorney. It must be the act and deed of the principal, done and executed by the attorney in his name. Stinchfield v. Little, 1 Am. Dec., 65; Endsley v. Strock, 50 Mo., 508; Story on Agency, sec. 147; Stockpole v. Arnold, 11 Mass., 27; Afridson v. Ladd, 12 Mass., 173; Hampshire v. Floyd, 39 Texas, 104; 5 Pet., 318; Carlisle v. Hart, 27 Texas, 352; McKin v. Williams, 48 Texas, 93; Montgomery v. Noyes, 73 Texas, 210; Frost v. Wolf, 77 Texas, 463.

8. The deed offered to be proven was void on its face, in that it purports to have been executed by Vicente Garza, acting as an attorney for the "heirs of Antonio Rivas," without naming the persons

whom said Garza considered to be the "heirs of Antonio Rivas," and whom he intended to bind by said deed; and therefore, the grantors for whom Garza intended to act, not being named on the face of the deed, the court could not presume who were in fact such "heirs of Rivas," in order to make certain the grantors. 3 Washb. Real Prop., 5 ed., sec. 12; Tied. Real Prop., sec. 798; Hall v. Leonard, 18 Pick., 27; Boone v. Moore, 14 Mass., 420; Cook v. Sinnamon, 47 Ill., 214; Rees v. Medlock, 27 Texas, 123; Endsley v. Strock, 50 Mo., 508; Stockpole v. Arnold, 11 Mass., 27.

GAINES, CHIEF JUSTICE.—This suit was brought by Cora C. Hutchings, joined by her husband, to recover of M. Goldfrank, Simon Lavenburg, Louis Lavenburg, and A. B. Frank an undivided one-half interest in a tract of twenty-eight leagues and ten labors of land originally granted by the King of Spain to Antonio Rivas, and patented by the State of Texas to his heirs, by virtue of a Special Act of the Legislature.

The plaintiff Mrs. Hutchings claimed title through two deeds executed to W. L. Cazneau, one in 1850 and the other in 1852. The evidence showed, that at the date of these deeds Cazneau was a married man, and that his wife was the grandmother of Mrs. Hutchings; that Cazneau and his wife were both dead, and that the latter left a will, in which she devised all her lands in Texas to her granddaughter for life.

The plaintiffs made no attempt to deraign title from the sovereignty of the soil, but sought to show that both parties claimed under a common source, and that Mrs. Hutchings had the superior title under that source. In order to establish this claim, they introduced in evidence a chain of title down to defendants as follows: 1. A deed executed April 19, 1875, by Vicente Garza, purporting to convey to John C. Crawford all the interest in the land in controversy which had been conveyed to the grantor, or which he had been authorized to convey by a certain instrument executed by the heirs and the assigns of heirs of Antonio Rivas (meaning them). 2. A deed dated November 1, 1876, executed by Vicente Garza for himself and more than thirty others, who are therein named, and are described as the heirs of Antonio Rivas, conveying to Crawford all the right, title, and interest of the grantors in the Rivas grant. 3. A deed of April 9, 1877, from John C. Crawford to A. B. Frank, conveying all the above named grant, except certain parcels previously conveyed to M. Goldfrank, the Lavenburgs, and others. 4. A deed from Frank and Goldfrank to the Lavenburgs, conveying all the grant except about four and one-half leagues.

In connection with these conveyances, the plaintiffs offered testimony tending to prove the execution of a deed to an undivided half-interest in the land in controversy from Vicente Garza, as attorney in fact of the heirs of Rivas, to W. L. Cazneau, which it was claimed

had been lost, and after diligent search could not be found.  The substance of that testimony is as follows:  One Angle testified, that in 1885 or 1886 he saw a deed signed by Vicente Garza, in which the grantor, as attorney for the heirs of Rivas, purported to convey to W. L. Cazneau an undivided one-half interest in the land in controversy; that the deed bore date July 12, 1852, and that neither in the body of the deed nor in the signature did the names of the heirs appear.  The instrument, when the witness saw it, was either in possession of Judge Ware or of A. M. Oliphant.

Oliphant deposed, that in 1877 he had a correspondence with one McManus, who professed to represent Cazneau, in relation to an interest claimed by Cazneau in the Rivas grant and another survey; that he received such a deed, but did not recollect from whom he received it, and did not know what he did with it.  He did not think he had delivered the deed to any one; but thought he had filed it away among some old papers, and that it had been lost.

Albert Turpe testified, that he saw such a deed in Oliphant's possession; that he was then county clerk of Maverick County; that McManus had sent him the deed by mail to be recorded, but that he did not record it, because it was not acknowledged for registration; that he returned it, with a suggestion that it be sent to Oliphant; and that he knew Vicente Garza's signature, and that the signature to the deed was his genuine signature.  He also testified, that he had never heard of the Cazneau claim to the land until in the year 1877, when a deed from Garza to Cazneau, dated in 1850, was sent to him for record; and that prior to that time, while he knew the grant, it was claimed by various persons under the Rivas title.

J. H. James, one of plaintiffs' attorneys, testified, that he made inquiry of J. A. Ware for the deed, and was informed by him, that if he had ever had such a deed it would be found among the papers of one Stone's estate, which were in the hands of one Riddle; and he, the witness, had made search among the papers of the estate in Riddle's possession, and was unable to find the deed.

It was also proved, that Oliphant informed another of plaintiffs' attorneys that he did not have the deed, but indicated where his (Oliphant's) old papers would be found; and that search was made in the place indicated, but that no papers were found there.

In this same connection, the plaintiffs also introduced a power of attorney from W. L. Cazneau to McManus, dated June 4, 1875, which authorized McManus to take charge of, manage, or sell Cazneau's real estate in Texas.

The evidence was objected to, upon the following grounds:  1. That the search was insufficient.  2. That the deed was void, because it does not disclose the names of the persons for whom Garza purported to convey.  3. That the signing and delivery of the instrument was not sufficiently proved.

The court sustained the objections and excluded the evidence, and the plaintiffs took a bill of exceptions.

The Court of Civil Appeals properly held, as we think, that the testimony as to the execution and contents of the deed was sufficient to go before the jury. But when we granted the writ of error, we were of opinion that they erroneously held, that the proof of the loss of the instrument was not sufficient. It still seems to us that the testimony shows that the deed was last seen in the possession of Oliphant, and to lead to the conclusion that it was lost while in his possession. We doubt if plaintiffs should have been reasonably required to go further in their search. But in the view we take of the case, we do not find it necessary to decide this question. For another reason, the exclusion of the deed was harmless, even if erroneous. It was unaccompanied by any power of attorney from the heirs of Rivas conferring authority upon Vicente Garza to convey their title to the land. Unless from the facts proved and offered to be proved the jury would have been authorized to presume the existence of the power of attorney, the deed was not admissible. Under certain circumstances, after a long lapse of time a power of attorney will be presumed in order to support a deed which purports to have been executed by virtue of such power. In many courts it is held, that proof of possession under the deed is necessary in order to establish such presumption.

The rule, that a deed or a power may be presumed after a long lapse of time, is not an arbitrary one. It does not rest upon any consideration of public policy with reference to quieting titles to property. It has its just foundation in the principle, that long and continuous acts of ownership, acquiesced in knowingly by those who hold an apparently adverse title, lead to the conclusion that the person so exercising such acts have acquired the title. Since possession is the most indubitable act of ownership which can be exercised by a claimant of land, it would seem, that in a country where there are no unoccupied lands it is reasonable to hold, that without such proof of such possession, the presumption of a grant will not be allowed. In a country, however, where much of its lands are unoccupied, a different rule should prevail; and therefore it has been held in this State, as in many others, that possession is not indispensably requisite to the presumption. Garner v. Lasker, 71 Texas, 431, and cases cited. In the case here cited, there was payment of taxes under a deed purporting to have been executed by virtue of a power of attorney, besides other acts showing a continuous claim to the land, and it was held that the power might be presumed. That case, in our opinion, was decided correctly; but my recollection is, that the court regarded it, as we now regard it, as pushing the doctrine to the very verge of authority. In the present case, there was no evidence as to any claim to the land whatever by the grantee in the deed in question for more than twenty-four years. That claim was asserted by the record of a deed to the same land, made in 1850. Even that can not be considered an assertion of right under the

deed now in question.   In so far as the evidence informs us, the latter instrument lay dormant, and was not brought to light until 1877 or 1878, when it was sent to the clerk of the County Court of the county in which the land lies, for record.   The clerk had never heard of Cazneau's claim until the previous deed was sent him.   Prior to that time, however, he knew the grant, and knew that it was claimed by various persons under the Rivas title.   It does not appear that either the heirs of Rivas, or any claiming under them, ever knew of the assertion of any title to the land by Cazneau or any one claiming under him.   The presumption of a grant or of a power from claim of ownership upon the one side, and an acquiescence upon the other, rests rather upon the acquiescence of the latter than upon the claim of the former. Without proof of such unequivocal acts of ownership long continued and brought home to the adverse party, acquiescence in the claim can not be established.   The case presented is that of a deed which purports to have been executed by virtue of a power of attorney, and which, it is true, is forty years old; but under which no claim appears to have been asserted for a quarter of a century.   The presumption would seem to be not that the power did in fact exist, but rather that it did not exist, or that for some other reason not disclosed, no title passed by the deed.

We are also of opinion, that the trial court did not err in excluding the evidence as to the deed, for the reason, that the testimony as to its contents discloses that the names of heirs for whom Garza purported to act appeared neither in the body nor in the signature to the instrument.   To hold the contrary, we should have to determine that the evidence was sufficient to authorize the jury to presume not only that Garza held a power of attorney from certain persons who claimed to be the heirs of Rivas, but also that those were the same persons for whom Garza purported to convey the land to Crawford more than twenty-four years afterwards.   It seems to us, that this would be to build one presumption upon another, which is never allowed.   The rule is elementary, that a presumption can be legally indulged only when the facts from which the presumption arises are proved by direct evidence; and that one presumption is not to be deduced from another. Laws. on Presump. Ev., 569.,

This brings us to the question of the correctness of the court's ruling in excluding the deed from Vicente Garza to Cazneau, dated the 19th day of August, 1850.   The objections to the deed were, in substance, that the conveyance of the land was prohibited by the Act of the Legislature of the State, of February 8, 1850, entitled "An act to provide for the investigation of land titles in certain counties therein mentioned," and that its execution was not duly proved.   The latter objection we need not consider.

The Act of February 8, 1850, provided for the appointment of a board of land commissioners to investigate and to report upon the titles to lands in certain counties lying between the Rio Grande and

Neuces River. Kinney County, in which the land in question was then embraced, was one of the counties mentioned in the provisions of the act. The board were required to make their report to the Legislature, with a view to a confirmation by legislative act of such titles as were found valid. Pasch. Dig., art. 4440. The act contains the following provision: "No sale by any claimant of land under the provisions of this act shall take place until after a title to the same shall have been confirmed to the original claimant or claimants, but all such sales of lands or claims to lands shall be void; and no claims to lands in the hands of a third person shall be recognized by the board of commissioners unless the sale or transfer of the same was made prior to the passage of this act." Pasch. Dig., art. 4455. The act further provided for the payment of certain fees by those who should avail themselves of its provisions, namely, $2 for each application, and in addition thereto, $1 for each town lot or parcel of land containing one acre or less; the sum of $3 for each tract of one labor or less, and $5 for each league or tract containing less than a league and more than one labor. Pasch. Dig., art. 4452.

It is insisted on behalf of the plaintiffs in error, that the act was void for several reasons. In the first place, it is claimed that the act is invalid, upon the ground that it is in conflict with that stipulation in the treaty of Guadalupe Hidalgo which guaranteed to Mexicans their rights of property in the territory ceded by Mexico to the United States. It is a sufficient answer to this objection to say, that neither the bill of exceptions nor the statement of facts discloses that Garza was, at the date of the treaty, a Mexican; that is to say, either a citizen, subject, or native of Mexico. The recital in the deed itself, that he was of the Republic, even if it could be taken as evidence against any one save the grantor himself, or those claiming under him, would be evidence only that he was a resident of the Republic at the date of the deed, and not that he was a "Mexican," within the meaning of the eighth section of the treaty, at the time of its ratification, in 1848.

But even if it had been shown that Garza belonged to either of the classes of Mexicans named in that section of the treaty, it is not perceived that this should lead to a different determination of the question. The provision of the treaty now under consideration simply secures Mexicans in their rights of property, and guarantees to them in that respect the same protection which is extended to citizens of the United States. Sec. 8 of Treaty; Charters and Constitution of U. S., vol. 1, p. 138. The Act of February 8, 1850, makes no distinction between citizens of the State or of the United States and citizens of Mexico. Its provisions are extended to all owners of land in the designated counties alike. They were all free to submit the evidences of their respective claims to the board, with a view to their confirmation; or they could repose upon their existing rights. The State v. Sais, 47 Texas, 307. It is clear, we think, that this legislation was neither a violation of the treaty of Guadalupe Hidalgo nor an invasion of any

right or reservation secured by the Constitution either of the State or of the United States.

But it is also insisted, that if the entire act be not invalid, section 18 is void, because it seeks to restrain the alienation of the lands which are made subject to the provisions of the act. That section is as follows: "No sale by any claimant under the provisions of this act shall take place until after a title to the same shall be confirmed to the original claimant or claimants; but all such sales of land or claims to land shall be void; and no claims to land in the hands of a third person shall be recognized by the board of commissioners, unless the sale or transfer of the same was made prior to the passage of this act." Pasch. Dig., art. 4455. The purpose of the statute was not to compel any owner to submit his title to the investigation of the commissioners. Without discussing in detail the provisions which lead to this conclusion, we deem it sufficient to say, that the act provides no mode by which the commissioners could acquire jurisdiction except by the voluntary submission of their claims on the part of the claimants, and that it contains no declaration that any claim not submitted shall be void. The Legislature could not take away or invalidate an existing title; and in no case will the courts impute to it an intention to exceed its powers, when a statute may fairly admit of another construction. The act was intended to confer a privilege, and not to impair a right. It imposed no burdens—except such as were subordinate to the purposes of the act, and then only upon such claimants as might voluntarily accept the benefits of the law. That this was a legitimate exercise of legislative power, we see no reason to doubt. Section 18 was probably intended to protect not only the State against such persons as might be disposed to purchase and prosecute unjust claims, but also the claimants themselves against an improvident alienation of just demands before their titles were made clear.

Neither can the contention be maintained, that section 15 provides for the payment of a tax that is unequal and not uniform. It levies no tax. It merely imposes upon claimants under the act the duty of paying certain fees, in order to defray in part, at least, the expenses incident to the investigation. But even if this provision should be held void, it would not avoid the whole act. If stricken out, it would leave a statute perfect in all its parts.

The "Rivas grant" is one of the tracts of land to which the State relinquished its title by the Act of February 10, 1852. Pasch. Dig., art. 4461. While the statute does not expressly so declare, we think it apparent from its provisions that this relinquishment or confirmation was made in pursuance of the report of the board of commissioners provided for by the Act of February 8, 1850. The petition described the land, the interest in which is sued for, as "the Antonio Rivas grant of land, * * * patented to the heirs of Antonio Rivas by the State of Texas, on the 8th of January, 1872." Since no other authority appears for the issuance of the patent, we are bound to con-

clude that it was issued in pursuance of the provisions of the second section of the Act of February 10, 1852, which made it the duty of the Commissioner of the General Land Office, upon a survey and return of the field notes of the respective tracts, to issue patents to the respective claimants. Who submitted the claim to the investigation of the land board, the record does not disclose. It is to be presumed, that it was by those who were the owners of the land at the time of the passage of the act. The commissioners were forbidden to recognize the claims of any "third persons," unless the sale or transfer to such persons was made before the law was passed. It is to be inferred, therefore, that if Garza owned any interest in the land before the act passed, he submitted it to the investigation of the commissioners, and thereby brought himself within that provision of the law which forbade a conveyance of the land until the title should be confirmed.

But for still another reason, we think that the plaintiffs were not prejudiced by the exclusion of the deeds. Their attempt was to recover an undivided one-half interest in the land by proof of title from a common source. In no possible view of the case, under the evidence adduced and offered, could they wholly dispossess the defendants. If they had succeeded in establishing their title from the common source to an undivided one-half of the land, the judgment would have been for such interest, for a writ to place them in possession of the land in common with the defendants. Now, our statute requires, that if the plaintiff in an action for trespass to try title sue for an undivided interest, he shall set out in his petition "the amount" of the interest claimed by him. Rev. Stats., art. 4786. It has been ruled, that he may recover a less interest than that alleged. But he should establish his title to the interest sued for, or to some less interest, definite in its extent. He can not recover by proving that he owns some undivided portion of the land, without establishing what that portion is. The judgment ought to determine the rights of the parties. It would be a manifest injustice to persons in possession of land, owning an undivided interest therein, to admit a plaintiff into joint possession with them, as a cotenant, without determining in the judgment the extent of his interest. As to the deed executed to Cazneau by Garza, in which he purported to act for the heirs of Rivas, without naming them, we think, for the reasons already given, that it can not be presumed that the persons whose title he assumed to pass were the same persons for whom he acted when, nearly a quarter of a century later, he undertook to convey to Crawford. As a matter of fact, the parties named in the first deed to Crawford as the heirs of Rivas are not the same as those named in the second. Some of them are the same, but others are named in each conveyance which are omitted from the other. When we look to Garza himself as the common source, the plaintiffs are in no better position. In the deed of November 1, 1876, under which defendants claim, Garza assumes to convey an interest owned by himself; but he also purports to convey in part as attorney of some of the heirs

who are named in the conveyance. What interest he claimed for himself and what for his principals, is wholly indeterminate. It follows, that even if plaintiffs had shown a superior right from the common source to whatever interest Garza purported to convey by the last named deed in his own right, they could not recover, because they have failed to show what that interest was. The case is similar to that of Howard v. Masterson, 77 Texas, 41, in which it was held, that the plaintiff had failed to establish title through a common source.

The judgment is affirmed.

*Affirmed.*

Delivered May 13, 1895.

· DENMAN, Associate Justice, did not sit in this case.