**STEPHENS v. HOUSE et al.    (No. 7957.)***

(Court of Civil Appeals of Texas.  Galveston. Oct. 25, 1923.  Rehearing Granted in Part Nov. 22, 1923.)

**1. Adverse possession ⬬27—Evidence held to sustain finding of adverse possession through tenants.**

In trespass to quiet title, evidence *held* to show that one of the defendants was in adverse possession of the land claimed by him through tenants living in "shacks" and occupying only small portions, but looking after the whole.

**2. Appeal and error ⬬1002—Verdict on conflicting evidence not disturbed.**

A verdict based on conflicting evidence cannot be disturbed on appeal.

**3. Evidence ⬬157(8)—Oral testimony properly not excluded under best evidence rule.**

Though on cross-examination defendant claiming by adverse possession testified that he had a written agreement with tenants in possession under him, *held*, that the court did not err in refusing to strike out the oral testimony concerning their possession as not the best evidence, where defendant on re-examination stated that when he spoke of a written agreement, he referred to certain affidavits made by the tenants after they had been in possession for more than 10 years.

**4. Evidence ⊛⇒372(8)—Presumptions in favor of ancient instrument held inapplicable.**

The rule that, when an ancient instrument purports to have been executed under power, the power will be presumed, could not be invoked to support contention that P. empowered J. to make a contract for him, where the contract on its face purported to have been made by J. in his capacity as administrator of an estate and did not attempt by its terms to bind the heirs, of whom J. was one, or to have been executed under authority from them.

**5. Trespass to try title ⊛⇒41(1)—Evidence held insufficient to show certain persons located survey and paid expenses as agreed.**

In trespass to try title, evidence *held* insufficient to sustain finding that certain persons to whom administrator had contracted to convey an undivided interest for so doing located the survey and paid the expenses of obtaining patent.

*On Motion for Rehearing.*

**6. Adverse possession ⊛⇒117—Finding held to mean defendant's tenants were in possession.**

In trespass to try title, involving an issue of adverse possession, the court's finding that defendants' tenants were living on a 1,135-acre tract (of which such defendant and others claimed 985 acres) from October 14, 1903, to October 14, 1913, *held* intended as a finding that they were in possession of the 985 acres; the finding being othererwise vain and useless.

**7. Adverse possession ⊛⇒95—Evidence held to warrant inference that taxes were paid.**

On the issue of adverse possession, evidence that lands were never listed for delinquent taxes, but that the records did not show dates of payment, warranted the inference that the taxes were paid when due and, in the absence of evidence to the contrary, was sufficient to sustain a finding to that effect.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by Susan Stephens against H. C. House and others. From a judgment for defendants, plaintiff appeals. Affirmed in part, and reversed and rendered in part, and remanded in conformity to opinion of Commission of Appeals (112 Tex. 459, 248 S. W. 30).

L. C. Kemp and Carothers & Brown, all of Houston, for appellant.

Tharp & Tharp, Baker, Botts, Parker & Garwood, R. W. Houk, and A. R. & W. P. Hamblen, all of Houston, and S. E. McHard, of Houston, for appellees.

PLEASANTS, C. J. This is an action of trespass to try title brought by appellant against H. C. House and a number of other defendants. The names of the defendants who are appellees herein will hereinafter appear.

The land sued for is an undivided one-sixth interest in the Mary Owens league and labor which is situated in part in Harris county.

The petition of plaintiff, in addition to the usual allegations in an action of trespass to try title, alleges that the defendants, Producers' Oil Company, Texas Company, H. C. House, Walter N. Brown, and A. R. Hamblen, had drilled oil wells on a portion of the land and had taken therefrom large quantities of oil, the exact amount of which was unknown to plaintiff but was within the knowledge of said defendants, and had converted same to their own use and benefit; that the value of the oil so converted by these defendants amounted to $250,000; and that by reason of such wrongful act of said defendants plaintiff had been damaged in the sum of $50,000. "That said Texas Company has taken over all of the assets of said Producers' Oil Company and has assumed all of the obligations of said Producers' Oil Company, and said Producers' Oil Company and Texas Company have been consolidated and are now doing business under the name Texas Company."

The prayer of the petition is for the recovery of the title and possession of the land against all of the defendants, and for an accounting by the defendants above named for all of the oil taken from said land subsequent to October 1, 1913.

The defendants H. C. House, A. R. Hamblen, and W. N. Brown disclaimed as to all of the land except a tract of 985 acres out of the Willard Richardson 1,135-acre tract off the south end of the Mary Owens league. As to this 985 acres these defendants pleaded not guilty and the statute of three, five, and ten years' limitation, and as against the claim for damages pleaded the two years' statute of limitation.

The defendants G. W. Tharp, Ethel Montgomery and her husband, H. C. Montgomery, Hattie Louisa Whitehead, Lawton Whitehead and Bernice Whitehead, minors, by their guardian, Ethel Montgomery, Marcie B. Smith and her husband, G. W. Smith, answered by a general denial and a plea of not guilty as to 125 acres off of the east end of what is commonly known as the W. R. Baker tract in the said Mary Owens league; the said G. W. Tharp owning and claiming an undivided six-tenths of said 125 acres, and the other defendants above named, the heirs of R. L. Whitehead, deceased, claiming an undivided four-tenths thereof. These defendants disclaimed as to all of the balance of the land sued for and asked for the 125 acres and is addition to their plea of not guilty pleaded the statute of limitation of three, five, and ten years.

The defendants Producers' Oil Company and the Texas Company, claiming a leasehold estate in the 985 acres claimed by A. R. Hamblen, W. N. Brown, and H. C. House, filed a plea of not guilty as to the tract, dis-

claimed all interest in the remainder of the tract sued for by plaintiff, and as to the 985 acres pleaded the statutes of three, five, and ten years' limitation, pleaded the statute of two years' limitation as to plaintiff's cause of action for damages, and pleaded innocent purchaser as to the permanent and valuable improvements made on said land.

The defendant Emery Albertson filed a plea of general denial and not guilty, and the statutes of three, five, and ten years' limitation.

The defendants W. A. Paddock and R. W. Houk disclaimed as to all interest in the land sued for except 62.8 acres, and as to the 62.8 acres pleaded not guilty, and the statutes of three, five, and ten years' limitation.

The defendant J. E. Lafferty filed an answer disclaiming all interest in the land sued for except 211 acres off of the west end of what is known as the W. R. Baker 336-acre tract, and being all of the 336-acre tract except 125 acres off of the east end thereof owned by G. W. Tharp and the Whitehead heirs, and as to this land he entered a plea of general denial, plea of not guilty, and pleaded the statutes of three, five, and ten years' limitation.

The plaintiff by supplemental petition pleaded minority on behalf of some of her children who had conveyed their title to her, and in addition thereto pleaded that the defendant H. C. House was out of the state during a certain period of time during which he was claiming the statute of limitation.

The judgment of the trial court, except that portion thereof in favor of the defendants above named, is not involved in this appeal; no question being raised by appellant's brief of the correctness of the judgment as to other appellants named in the appeal bond.

The case was tried with a jury in the court below, and upon the findings of the jury upon special issues and findings of fact by the trial court, judgment was rendered in favor of appellees.

For the purposes of this opinion the following is a sufficient statement of the facts disclosed by the record:

The appellant deraigns title under Patrick Reels, a son of Mary Owens, the original grantee, who inherited from her mother an undivided one-sixth interest in the land in controversy.

Patrick Reels and John Owens, another son of Mary Owens, "as curators" for Mary Owens, deceased, appeared before the board of land commissioners of Harrisburg county on January 4, 1838, and made the affidavits necessary to obtain the certificate upon which the land is located.

On February 9, 1838, John Owens, purporting to act as administrator of his mother's estate, and also claiming to act for the heirs, entered into a contract with William Burch, and Bernard Caraher, whereby Burch and Caraher agreed to locate the league and labor to which Mary Owens was entitled, and have same surveyed and pay all expenses of obtaining the title, and John Owens obligated himself, and undertook to obligate the other heirs, to make a conveyance to them of one-fourth of the league and all of the labor whenever the title could be procured from the land office. This instrument was filed for record in Harris county on September 8, 1843. The certificate was issued November 10, 1838. The patent was issued to the heirs of Mary Owens October 10, 1845.

No conveyance was ever made by any of the heirs of Mary Owens to Burch and Caraher, and the only evidence tending to show that the contract to locate the land and pay all expenses necessary to obtain the title from the government was performed by Burch and Caraher is a pencil memorandum on the surveyor's record in Harris county stating that the field notes of the survey were delivered to Burch and that fees of $5 were paid by him, and the fact that after the death of both the administrator of each inventoried, as belonging to the estate of the decedent, an undivided one-eighth of the Mary Owens survey. The Burch claim was sold by his administrator for $30, and Caraher's claim was sold in 1854 for 25 cents per acre.

There is no evidence that the contract made by John Owens, as administrator and agent of the other heirs of Mary Owens, was authorized or approved by the probate court in which the administration was had, or was ratified by the other heirs, or that they had any knowledge of such contract.

Patrick Reels lived in Colorado county and died there prior to November 29, 1848, on which date Travis Miller was appointed administrator of his estate. The inventory of the estate of Patrick Reels filed by Travis Miller does not include any land in the Mary Owens survey, and it is not shown that Patrick Reels ever paid any taxes or exercised any acts of ownership over this land. He was married in 1837, his wife predeceased him, and he left as his surviving heirs four sons, James, George, Joseph, and John, the eldest of whom could not have been more than 10 years of age. After the death of their father, these children were separated, and none of them lived to be grown. George died when he was 12 or 13 years of age; Joseph when he was between 8 and 12 years of age; John when a mere infant; and James, the last survivor, in 1858. On the death of James any interest that Patrick Reels had in the Mary Owens survey at the time of her death passed to Diana Miller, a half-sister of James. Diana married Henry Obenbaus about 1856, and shortly thereafter her mind became impaired as the result of a blow on the head. She died in 1879, leaving as her only heir a son, Jacob Miller, who was married to appellant in 1865. He died in 1894, leaving several children. Appellant thereafter married James Stephens, who is

now dead. All of the children of Jacob Miller and appellant have conveyed to her all of their interest in the land in controversy.

On May 26, 1852, John Owens, Alexander Armstrong, Emily Robinson, and Mary White (formerly Mary Owens), joined by her husband, Henry White, conveyed to W. R. Baker the following described land:

"One labor of land granted to Mary Owens and the undivided one-fourth of one league of land granted to the heirs of Mary Owens lying on the N. side of the San Jacinto river and bounded by Massie on the W. and Votaw on the E. For more full description reference is made to the patent of the same."

The deed recites that the grantors are heirs of Mary Owens.

On the same day John Owens, Alexander Armstrong, and Emily Robinson conveyed to J. D. Waters an undivided one-fourth of the Mary Owens league. This deed recites that the grantors are heirs of Mary Owens and describes the land conveyed as follows:

"An undivided interest in one league of land granted to the heirs of Mary Owens of eleven hundred and seven acres, being the undivided one-fourth part thereof, being the balance due the parties of the first part as heirs of said Mary Owens, after having given one-fourth of said league to W. R. Baker, deed heretofore made."

On February 10, 1853, Mary and Henry White conveyed to W. R. Baker a portion of the Mary Owens league described as:

"All the right and title of the parties of the first part in and to a league of land granted to Mary Owens, lying on the northeast side of the W. San Jacinto river, they being entitled to one-fourth share of the estate of Mary Owens as heirs and they having heretofore conveyed an undivided fourth of their share of said land to W. R. Baker do now convey the balance of their interest, amounting to 815 acres not transferred. Also the share owned by ——— Owens who lives in Louisiana, a brother of the said Mary White."

In 1849 W. R. Baker purchased the claim of the Burch estate to an undivided one-eighth of the league.

In 1854 Ann Earle purchased from the Caraher estate an undivided one-eighth of the league.

It should have been before stated that the administration of the estate of Patrick Reels was closed in 1850. The order of the probate court closing the administration and discharging the administrator recites that there was no property for distribution among the heirs.

After the deed to Walters before mentioned, he rendered 1,107 acres of the Mary Owens league for taxes for many years prior to 1874, when he sold to Willard Richardson.

On September 1, 1856, W. R. Baker sold 2,435 acres of the Mary Owens league to Jacob Sharp.

In 1860 Sharp sold this 2,435 acres to Wilson Bros.

Baker began to render this land for taxes shortly after his purchase from the Owens' heirs, and it was generally rendered by or assessed in the name of its subsequent owners.

By a deed of partition executed on March 23, 1880, by T. H. Wilson, John E. Wilson, J. F. Wilson, W. R. Baker, Louisa B. Richardson, and Ann Earle, all of the Mary Owens league was partitioned and conveyed. By this deed one-fourth of the league, 1,107 acres, described by metes and bounds, off the south end of the league, was set aside and conveyed to Louisa B. Richardson. A tract of 336 acres adjoining the Richardson tract was set aside and conveyed to W. R. Baker. Wilson Bros. were given a tract of 2,435 acres, and the balance of the survey was set aside and conveyed to Ann Earle. A year or two prior to this deed of partition, several sawmills had been established on and near the Mary Owens survey, and timber from the survey was sold to these mills by the parties to the deed above mentioned before the execution of the deed, and the proceeds of such sale divided between the grantors in the proportion of the interest claimed by them in the survey in their subsequent deed of partition. After the execution of this partition deed, a number of sales of land on the survey were made by the respective parties to said deed, and they and those holding under them have continued from that time to claim all of the survey and have exercised every act of ownership thereof.

The plaintiff knew nothing of the Owens league and never knew that her first husband, Jacob Miller, ever owned any interest therein until shortly before this suit was brought. Jacob Miller lived and died in Colorado county, and there is no evidence from which it can be reasonably inferred that he ever knew anything about the Mary Owens survey, or had any idea that he owned any interest therein through inheritance under Patrick Reels. Nor is there any evidence tending to show that the children of Jacob Miller had any knowledge of their interest in the survey until they conveyed to their mother, plaintiff herein, a short time before this suit was filed.

No deed or transfer from Patrick Reels or any of his heirs was produced in evidence, though diligent search was made therefor, and there is no evidence that there was ever such deed or transfer in existence other than the circumstances shown by the facts before stated.

Among other findings of the jury upon issues submitted to them are the following: That Patrick Reels made a transfer or a deed of conveyance of his interest in the land in controversy to John Owens, Alexander Armstrong, Emily Robinson, and Mary White; that Burch and Caraher located the Mary Owens league and labor in accordance

with their contract with John Owens, before set out, and paid all the expenses necessary in obtaining the title to the grant; and that the execution of the agreement by John Owens was either authorized or was ratified by Patrick Reels.

The evidence and findings of the jury and court upon the issue of limitation pleaded by H. C. House, A. R. Hamblen, and W. H. Brown are as follows: House purchased the 1,107 acres set aside to Louisa B. Richardson by the deed of partition before set out, in 1898, the land being conveyed to him by Mrs. Cook. He subsequently conveyed 150 acres of this land to W. P. Hamblen, and an interest in the remainder to A. R. Hamblen and W. N. Brown. He testified:

"We placed Mr. Weeden on this tract, also an old darkey, Ed Abberson, and one named McGuire, a white man named Reese, and another named Romaine, and two or three others. Abberson has been there 15 years. McGuire has been there about the same length of time. Reese has been there 10 or 12 years, and Romaine 4 or 5 years. These men had log houses on the land inclosed by rail fenses, inclosing gardens and truck patches. Some of these men have been on the land for 16 years, ever since I owned it. * * *

"As to what has been my possession of that land from the time I bought it down to the present time, it has been continuous. I have had improvements on the place, and Weeden has been operating it and cutting wood, and he has been there with improvements and fences around it. The possession has been continuous. We have had Mr. Weeden in charge, and he had men there, and houses built on the property, and fences inclosing portions of the ground under cultivation, and we have made a lease to practically five different persons.

"During the time I have owned, or the time since I purchased the House (land), there has been no assertion whatever of title against me prior to the filing of this suit.

"I had an understanding with Ed Abberson when I put him there. The understanding was that I gave him permission to stay there as long as he took care of the property. The condition he was there on was that he was to be there and be a watchman there, and was to look after the entire property and report to me if any one trespassed, if any squatter came in any place on the property. No one was allowed to stay on that property unless they worked for Mr. Weeden. It was the same way with Charlie Guy, the same way with Reese and others. * * * I had Abberson there on the condition that he was to notify me if anybody encroached on that land. I testified to that before. I think. * * * With the assistance of those people that have been out there and have houses there, I have put houses and things like that on the property since I bought it. We furnished money to the men for buying seed for planting gardens, and I think there were some portions of the buildings that were put on there by Morrison and Norton that I paid for. That building was occupied, I think, by Abberson, which was about the center there. I think it was a three-room house with a lean-to that I paid for. * * * I have been pay-ing taxes on this property all the time. I have assessed the property for 21 years, year, by year, and I have been paying taxes on it for 20 years, year by year, as they accrued."

W. P. Hamblen testified:

"From 1899 to 1904 I was out and on this House tract on an average of possibly once every three or four months. At my earliest visits there, say in 1900 or 1899, Weeden was cutting wood off of that House tract, and he had a number of men working for him, and they had their houses there, little shacks, some of them made out of logs and some of them were made out of split boards, and they were usually one or two room shacks. Some of them had little garden patches around them, and the men were working in there for Weeden. * * * McGuire has been in there ever since I can remember. Abberson, has been there a long time, I would say 16 or 17 years. Charlie Guy has been there a long time—I don't know just how long. He was there for some time before the deed from Mr. House was made to my father for the 150 acres. The deed shows that it was in 1905 or 1906. I have forgotten which, but Guy was there several years before that. * * * On the southern portion practically all the pine has been taken off, and some of the oak. It has been cut over generally, and you can go in there and see stumps all over it where it has been cut. Mr. Weeden and his men were cutting and hauling wood there every time I went out on the land. I don't believe I missed a time of either seeing the actual cutting, or recent evidence of cutting there."

A. R. Hamblen testified:

"The House tract is a part of the Mary Owens. I first became acquainted with that tract of land in 1899, and since that time I have been on it many times. I should say I have been on the land an average of twice a year since that time. I know about the operations carried on by Mr. Weeden on this tract of land, known as the House tract. Those operations by Mr. Weeden began shortly after the purchase of the tract; I should say that Mr. Weeden's work out there commenced immediately after the execution of the contract between Mr. Weeden and Mr. House. Mr. Weeden went out there on this House tract and established his camp—his cordwood outfit. He had men employed to cut the timber—men who lived on the land cutting the timber. They had their little houses, some call them shacks, and some had little cabins, fenced in, and they cut the timber, and men lived there. I expect Abberson has been on the land nearly 20 years. I am satisfied he has been there 16 or 17 years. I said I was out there probably two times a year. When I would go out there, I would see Abberson living there, and he had a little garden in cultivation, and this tract down on the river, marked 'Abberson,' of some five or six or seven acres, he was cultivating that. I knew a man who called himself Reese—a white man. He lived on this tract of land known as the, House tract. Reese had a little house with a little garden around it. I knew Charlie Guy lived out there. He was living on what he called the Hamblen tract of land, and it extended over on the House tract. I would not attempt to say exactly when Guy went on that

tract of land, but it was shortly after the execution of the Weeden contract I mentioned. In other words, when Guy first went out there, he was on the House land—what was known as the House tract. Since that time the Hamblen tract has been cut out of the 1,107 acres, giving Judge Hamblen a 150-acre tract, and in cutting it out, the place that Guy was occupying is in part on the Hamblen tract, and in part of the House tract. There has not been any period of time, so far as I know, that Guy was not living on that tract of land since he went there in 1899. He was always using it, Guy has lived there in this house and cultivated this land."

Defendants introduced a written lease from H. C. House to W. T. Weeden, executed on January 5, 1899, covering the 985 acres in controversy. This lease contains the following provisions:

"Said Weeden is to hold possession of said land, and have thereon such wood and timber camps as are necessary to carry on his wood and timber business for the term of two years from this date, subject to the conditions of this contract, with such switches as he may require, free from rent, but the same must be used for the purposes only of shipping wood and timber from said land.

"Said Weeden shall not take any timber or wood from said land except he ships same by rail from his switches on said land.

"H. C. House agrees to sell the cordwood on said tract of land, both oak and pine, for 30 cents per cord of 128 cubic feet, and if other kinds of timber are sold, such as ties or piling, then the price for stumpage shall be agreed upon in writing.

"Payment for such wood and timber shall be made monthly from date, the amount to be ascertained from the books of the Houston East & West Texas Railway Company.

"In cutting said wood, said Weeden shall cut entirely across the tract of land from west to east, beginning his cutting at the northwest corner of the tract and along the north line, and shall cut not further south on the west line then 500 varas, and eastwardly to the east line of the tract until the strip of 500 varas wide from west to east is cut clean of timber suitable for wood, and then other like strips south until all the timber is cut."

Weeden testified, in substance, that he took possession of the land under this lease and had been there cutting wood under the terms of this lease for 17 years; that no one else was on the land, except persons who were employed by him to cut wood; and that some of his employees built little houses or shacks on the land in which they lived and which they moved from one portion of the land to another as the woodcutting progressed. He also testified that McGuire had been on the land for more than 17 years; that Reese was there for 12 years; and that there was a man named Abberson there who is still there. This suit was filed October 14, 1913.

Upon this evidence the jury found that Ed Abberson, Reese, McGuire, and Charles Guy each entered upon the land in controversy under an agreement with H. C. House to hold possession of the entire tract of 985 acres for House. At the request of appellant, the trial court filed conclusions of fact, among which is the following:

"I further find that Abberson, McGuire, Guy and Reese were living on the 1,135-acre tract of land covered by the Weeden lease from October 14, 1903, to October 14, 1913."

No issue of limitation as to the other appellees was submitted to the jury, and there is no finding by the court on such issue as to them, and no evidence has been pointed out by the briefs to sustain the pleas of limitation of any of the appellees except H. C. House, A. R. Hamblen, and W. N. Brown.

When this case was first considered by us, we reached the conclusion that the issue of the execution of a deed or transfer of his interest in the land by Patrick Reels was not raised by the evidence and should not have been submitted to the jury, but because of the fact that the Court of Appeals for the Ninth District had held upon a former appeal of this case (House v. Stephens, 198 S. W. 384) that the evidence, which was the same on that appeal as on this, did not raise the issue, we conceived it to be our duty to certify the question to the Supreme Court. The answer to the question certified by us holds that issue is not raised by the evidence. Stephens v. House, 112 Tex. 459, 248 S. W. 30.

This issue being now out of the case, the questions left for our determination is whether the findings of the jury and court in favor of appellees, House, Hamblen, and Brown upon their pleas of limitation is sustained by the evidence, and whether there is any evidence to sustain the finding of the jury that Patrick Reels either authorized or ratified the contract between John Owens and Burch and Caraher for the location of the certificates and obtaining a patent to the land; and the further question as to the sufficiency of the evidence to sustain the findings of the jury that Burch and Caraher located the survey and paid the expenses of obtaining title from the state thereto.

[1] It seems to us that the evidence before set out is amply sufficient to sustain the findings of the jury and the court that House, through his tenants before named, had actual, exclusive, adverse possession of the 985 acres of land before described, cultivating, using, and enjoying the same, as those terms are used in our limitation statute, for more than 10 years before plaintiff's suit was filed. The actual possession of these tenants was only a small portion of the tract, and the location of the actual possession of some of them seems to have been changed several times; but if, as House testified, each of them was placed on the land under

an agreement with him "to be a watchman there and to look after the entire property and report to him if anyone trespassed," and they remained on the land under this agreement, House having a deed to the land and claiming the whole tract, his possession through these tenants extended to the boundaries set out in his deed. The houses occupied by the tenants may have been only "shacks," and the amount of land actually used by them very small; but such improvements and occupancy must be held sufficient under our statute to give notice of an adverse claim to the land.

[2] House's testimony as to his agreement with these tenants is contradicted by at least one of the tenants, but this conflict in the evidence was determined by the jury and court in his favor, and we are not authorized because of it to disturb the verdict and the findings of the court.

[3] On cross-examination House testified that he had a written agreement with these tenants, and thereupon the plaintiff moved the court to exclude his oral testimony on the ground that the written contract was the best evidence of the terms of the agreement, and such written instrument not having been shown to be lost, oral testimony as to its contents was inadmissible. The bill of exceptions taken by appellant discloses that upon re-examination House stated that when he spoke of a written agreement with the tenants, he referred to certain affidavits made by the tenants after they had been in possession for more than 10 years. There was no other testimony showing a written agreement between the tenants and House. In these circumstances, we do not think the court erred in refusing to strike out the testimony.

We agree with appellant that the finding of the jury that Patrick Reels either authorized or ratified the contract for the location of the survey made by John Owens with Burch and Caraher is without any evidence to support it.

This contract, on its face, purports to have been made by John Owens in his capacity of administrator of the estate of Mary Owens, deceased; but the grantor does attempt by the terms of the instrument to bind the heirs of the estate in the following expressions: "I, John Owens, for myself and other heirs," and "I, John Owens, for myself and the heirs to the estate of the aforesaid Mary Owens, hereby covenant and agree, etc." None of the heirs of Mary Owens are named in the instrument, and the grantor does not claim to act under any express authority from any one.

[4] Such being the character of the instrument, the rule that, when an ancient instrument purports to have been executed under a power, the power will be presumed, cannot be invoked in support of appellees'

contention that Patrick Reels empowered John Owens to make his contract for him. Baldwin v. Goldfrank, 88 Tex. 258, 31 S. W. 1064.

We cannot agree with appellees that the circumstances shown by the evidence before set out are sufficient to sustain the finding that Patrick Reels either authorized or ratified the execution of this contract by John Owens. The evidence is no stronger in favor of appellees upon this issue than upon the issue of the execution of a deed by Patrick Reels conveying his interest in the land to the other heirs of Mary Owens, and the holding of the Supreme Court before cited, upon the issue of the execution of such a deed, is, we think, conclusive against appellees' contention that the evidence sustains the findings of the jury that the contract with Burch and Caraher was either authorized or ratified by Patrick Reels.

[5] We are also of opinion that the evidence is insufficient to sustain the findings that Burch and Caraher located the survey under this contract with John Owens and paid all the expenses of obtaining the issuance of the patent. The only evidence tending to sustain these findings is a memorandum found on the surveyor's record for Harrisburg county on July 30, 1839, stating that a copy of the field notes of the survey was delivered to Wm. Burch and the fees therefor of $5 were paid by him, and the subsequent claim of the administrators of the estates of Burch and Caraher to one-fourth interest in the land. It is not shown that this claim was acquiesced in by any of the Owens heirs who conveyed the entire property prior to any conveyance by said administrators. The nominal price for which the claims of these estates in the land were sold indicates that the claims were not regarded as valid. In addition to this, the undisputed evidence shows that the fees for obtaining the patent, amounting to $45, were paid by John Owens. This evidence is, we think, clearly insufficient to sustain the findings that Burch and Caraher located the survey and paid the expenses of obtaining the patent.

The only title asserted by the appellees G. W. Tharp and others to the 125 acres of the W. R. Baker 336-acre tract claimed by them, except title by limitation which is not supported by any evidence, is deraigned from Wm. Burch. This is also true of the title asserted by appellee Lafferty to the 211 acres of said Baker tract claimed by him.

As before said, there is no evidence to sustain the plea of title by limitation of appellees W. A. Paddock and R. W. Houk to the 62.8-acre tract claimed by them.

No title of any kind was shown by the appellee Emery Albertson to any part of the land.

It follows from these conclusions that the

judgment of the trial court in favor of appellees, H. C. House, A. R. Hamblen, and W. N. Brown, and the Producers' Oil Company and the Texas Company, as to the 985 acres of land claimed by them should be affirmed, and that the judgment in favor of the other appellees should be reversed and judgment here rendered in favor of appellant for an undivided one-sixth interest in the land claimed by said appellees, and it has been so ordered.

Affirmed in part, and reversed and rendered in part.

### On Motion for Rehearing.

Appellant, in a motion for rehearing, has pointed out that the uncontradicted evidence in the record shows that one of the vendors of appellant, Frederick Miller, who owned a 5/224 interest in the land in controversy, was a minor up to the time of his conveyance to appellant in 1912, the year preceding the filing of this suit. Such being the fact, our holding that the appellees, House, Hamblen, and Brown, have title by limitation to the 985 acres of land in controversy claimed by them, is erroneous, and our former judgment should be modified to the extent of rendering judgment for appellant for an undivided 5/224 of said 985-acre tract. This judgment in favor of appellant carries with it the interest above designated in the oil taken from the land by the defendant oil companies, and, under an agreement of the parties, requires a remanding of the cause to the district court for the purpose of having that court determine the amount and value of the oil taken from the land.

The other grounds for rehearing urged in the motion are without merit.

[6] We think the finding of the trial court upon the issue of the possession of House's tenants, set out in our original opinion, was clearly intended as a finding that these tenants were in possession of the 985-acre tract of land, and that the evidence supports such finding. The finding would have no bearing upon the issue before the court unless it referred to the 985-acre tract, and if it is not given this meaning we must assume that in answer to appellees' request for a finding upon the issue the court made a vain and useless finding. The finding was not so considered by any of the parties to the litigation until appellant's motion for rehearing was filed.

As before said, we think the evidence justifies the finding that at all times during the 10 years next preceding the filing of this suit some one or more of the tenants mentioned in the court's findings was living on the 985 acres of land and holding possession thereof under the agreement with House, as found by the jury. It was not necessary for the establishment of the plea of limitation that all of said tenants should have been on the land during all of the 10 years. A further examination of the record discloses that the defendants' plea of 5 years' limitation should be sustained.

[7] The undisputed evidence shows that all taxes on this land were paid by the defendants from the year 1885 up to the time of the trial. The dates of these payments are not shown, but it was shown by the tax collector of Harris county that the delinquent tax records of the county, which extended back to the year 1885, do not show that this land was ever listed for delinquent taxes. It further appears that the records of the collector's office do not show the dates of the payment of taxes.

We think the reasonable inference from this evidence is that the taxes were paid when due, and in the absence of any evidence to the contrary, is sufficient to sustain the finding that the taxes were so paid.

This finding disposes of appellant's contention that she is entitled to recover the 5/224 interest owned by Lizzie Litzler and conveyed to appellant in 1912, on the ground that such interest was protected against the running of the statute of limitation by the minority of her grantor. The evidence shows that Lizzie Litzler was born on April 14, 1885, and therefore became 21 years of age on April 14, 1906, which was more than 5 years before the filing of this suit.

It follows from what we have said that the motion for rehearing should be refused, except as to the Frederick Miller interest, for which judgment should be here rendered for appellant, and the cause remanded to the trial court for a hearing only on the question of value of the oil taken from the land, and it is so ordered.