**MARTIN et al. v. TEXAS CO. et al.**

No. 13242.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 25, 1935.

Rehearing Denied Dec. 6, 1935.

261

C. B. Felder and Bunnenberg & Shell, all of Wichita Falls, for appellee Schnackenberg.

H. S. Garrett and H. R. Wilson, both of Fort Worth, for appellee Texas Co.

DUNKLIN, Chief Justice.

Plaintiffs in this suit, who were the sole heirs of J. S. Martin, deceased, sought recovery of title to an undivided one-half interest of the oil and gas and other minerals in 160 acres in the northwest corner of the F. W. Huseman survey and also for 1/16 of all royalties accruing from 2½ acres out of said 160-acre tract which was drilled by the Texas Company, one of the defendants.

J. L. Schnackenberg was made a defendant upon allegations that he was asserting title adverse to that of plaintiffs. He filed an answer disclaiming title to the mineral rights in a portion of the 160-acre tract, but asserting title adverse to plaintiffs to the minerals in the remaining portion and to all the oil royalties in controversy.

The Texas Company was operating under two separate oil leases, one of which was the basis of plaintiffs' claim and the other that of Schnackenberg. It deposited those disputed royalties with the Security State Bank & Trust Company, doing business in the town of Ralls, Crosby county, Tex. Both the Texas Company and the Security Bank & Trust Company were also made defendants, but they pleaded that they were mere disinterested stakeholders and invoked the jurisdiction of the court to determine to whom those royalties belonged.

Upon a trial before the court without a jury, judgment was rendered in favor of plaintiffs for an undivided one-half interest in the minerals in that portion of the 160-acre tract covered by defendant Schnackenberg's disclaimer, but awarding to Schnackenberg title to the oil and gas rights in the balance of the tract, and also for all of the oil royalties held in trust by the Security Bank & Trust Company.

Following are findings of fact and conclusions of law filed by the trial judge:

"Findings of Fact.

"1. Plaintiffs herein are the heirs of J. S. Martin, deceased, and assert ownership of an undivided one-half interest in and to

Carrigan, Hoffman & Carrigan, of Wichita Falls, for appellants.

the oil, gas and other minerals in and under one hundred sixty (160) acres of land out of the northwest corner of the F. W. Huseman survey in Wichita County, Texas, and that the defendant, J. L. Schanckenberg, is the owner of the other undivided one-half interest in the oil, gas and other minerals in and under said 160 acre tract of land, and said plaintiffs further seek a decree of partition of said mineral rights between plaintiffs and the defendant J. L. Schnackenberg. Plaintiffs further seek to recover the proceeds of one-half the royalty oil produced from the contested estate during the latter part of the year 1920, and the years of 1920 and 1922 by J. I. Staley and now held by the defendant bank.

"The defendants, The Texas Company and the Security State Bank and Trust Company of Ralls, Texas, in effect, are stakeholders and the money arising from the sale of the $\frac{1}{16}$ royalty oil in litigation is held by said bank subject to the decision in this cause.

"It was agreed between all the parties hereto that the plaintiffs on the one hand and the defendant Schnackenberg on the other would look alone to the funds so held by the bank in Ralls, after allowing $75.00 to said bank for attorneys fees and incidental expenses.

"The defendant, J. L. Schnackenberg, denies any right, title or interest of the plaintiffs in the land upon which the royalty oil was produced and asserts full title in himself to said land, including all the oil, gas and other minerals and that he was entitled to the one-half of the proceeds of the royalty oil in litigation.

"The defendant, Schnackenberg, disclaimed as to the interest sought by plaintiffs in that part of the 160 acre tract of land lying south of the center of the public road, which road is a dividing line between the lands of J. L. Schnackenberg and C. Birk.

"The Staley well was located upon and the oil produced from the well drilled by J. I. Staley upon that part of the land described in plaintiffs' petition lying north of said public road and C. Birk's land.

"Defendant Schnackenberg further pleaded all of the statutes of limitation.

"The material question is the ownership of the one-half interest in the minerals under the land in question. If the plaintiffs own the disputed undivided one-half interest in the minerals including the oil and gas under the land they are entitled to judgment. If the defendant Schnackenberg owns the disputed one-half interest of the minerals including the oil and gas under the land, he is entitled to judgment.

"2. J. G. Eustis is a common source of title.

"3. Plaintiffs are the heirs and only heirs of J. S. Martin and as such deraigned title from J. G. Eustis by and through the following instrument, towit:

" 'J. G. Eustis by Atty   Deed   J. S. Martin

" 'The State of Texas, County of Clay:

" 'Know all men by these presents: That I, J. G. Eustis, of the County of Philadelphia, State of Pennsylvania, by my attorney in fact W. G. Eustis of the County of Clay and State aforesaid in consideration of the sum of one dollar to me in hand paid by J. S. Martin have granted, sold and conveyed and by these presents do grant, sell and convey unto the said J. S. Martin, of the County of Clay and State aforesaid all of my rights, title and interest in and to an undivided half of one hundred sixty acres of land in Wichita County on Red River about eleven miles above the mouth of Gilbert Creek out of a Sur of one third of a league located by virtue of Cert. No. 10 issued to F. W. Huseman beginning at the northwest corner of said Huseman sur. Thence north 64° E 528 vr. Thence south 216 vrs. Thence west 475 vs. to west boundary of said Huseman sur; thence north 1728 vs. to the place of beginning containing one hundred and sixty acres of land, the object of this deed being to convey an undivided half of my right, title and interest in the above described one hundred and sixty acres of land.

" 'To have and to hold the above described premises together with all and singular the rights and appurtenances thereto in anywise belonging unto the said J. S. Martin, his heirs and assigns forever, and I do hereby bind myself, heirs, executors and administrators to warrant and forever defend all and singular the said premises unto the said J. S. Martin, his heirs and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof through, by or under me.

" 'Witness my hand at Henrietta this 4 day of June, 1881.

" 'J. G. Eustis, by his atty.

" 'W. G. Eustis.

" 'The State of Texas, County of Clay:

" 'Before me, L. C. Barrett, a notary public in and for Clay County, Texas, on this day personally appeared W. G. Eustis, known to me to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

" 'Given under my hand and seal of office this 4th day of June, A. D. 1881.
                " 'L. C. Barrett Notary Public
                        Clay County, Texas.
" '(Seal)
" 'Filed and recorded June 20, 1882.
        " 'J. M. Hammond Co. Clerk
            " 'By W. W. Carroll Depy.'

"4. No power of attorney was ever executed by J. G. Eustis to W. G. Eustis authorizing the sale or conveyance of said land.

"5. As part consideration for the execution of said instrument the said J. S. Martin agreed to pay the proportionate part of a vendor's lien note in the sum of $2,212.00, which was a lien against said property.

"No part of same was paid by said J. S. Martin nor those claiming under him, nor was the part of the purchase price so assumed by the said J. S. Martin ever offered or tendered by the said J. S. Martin or those claiming under him ever paid the One Dollar cash consideration recited in above described deed.

"6. Neither the said J. S. Martin or those claiming under him ever took actual possession of the premises or the minerals thereunder.

"No taxes were ever paid upon said property, nor the mineral estate therein, by the said J. S. Martin or those claiming under him.

"7. Defendant J. L. Schnackenberg deraigns title from J. G. Eustis to the one-half interest in the one hundred sixty (160) acres less the part disclaimed in his answer, by and through a judgment of the District Court of Wichita County, Texas, entered December 6, 1911, in a suit filed February 18, 1911, entitled George P. Holtzen v. J. G. Eustis et al No. 4050.

"8. J. G. Eustis was at all times a resident of Philadelphia, Pennsylvania, and never had any notice or information of the said deed executed in his name by his brother, W. G. Eustis, as attorney in fact, to J. S. Martin.

"Said J. G. Eustis never authorized W. G. Eustis to ratify or recognize said instrument. Neither said J. G. Eustis or his widow Parmalee Baylor Tyler Eustis ever ratified or recognized said instrument.

"9. George P. Holtzen purchased the land and premises in question from J. W. Morgan for a valuable consideration paid in cash without notice or knowledge, actual constructive, of any claims either legal or equitable on the part of J. S. Martin, or his heirs, which said deed was filed for record ⸺ day of ⸺ 1901.

"J. L. Schnackenberg purchased the land and premises in question from George P. Holtzen for a valuable consideration paid in cash without notice or knowledge of any claim whatever, either legal or equitable on the part of J. S. Martin, or his heirs, which said deed was filed for record November 9, 1914.

"10. On June 23, 1911, George P. Holtzen executed to Corsicana Petroleum Company a conveyance of all the oil, gas and other minerals under his lands, including the land in controversy, which instrument was filed for record on June 29, 1911.

"On February 24, 1918, by mineral lease duly recorded on February 16, 1917, J. L. Schnackenberg and wife, leased the lands and premises in question to F. E. Rosenberger and S. C. Montgomery Jr., for the purpose of exploiting the premises in question for all copper and all other minerals, except oil and gas, reserving unto the lessor all of the royalty to be derived from the minerals produced.

"Said lessees promptly went upon said premises, took possession of all the minerals therein, except oil and gas, and made pits and excavations and removed therefrom small quantities of mineral ore, including copper ore.

"11. On November 6, 1918, J. L. Schnackenberg and wife executed an oil and gas lease contract, conveying to J. R. McGee all the oil and gas in and under the disputed premises, and reserved to themselves all the royalty oil and gas, which instrument was duly filed for record on January 23, 1919.

"Thereafter J. I. Staley acquired by mesne assignment the said oil and gas leasehold estate to a part of the premises in question.

"On May 5, 1919, J. I. Staley also obtained an oil and gas lease from the plain-

264

tiffs herein to an undivided one-half interest of certain lands including the land in controversy.

"In said lease contract with the Martin heirs, authority was given to the said J. I. Staley to prosecute a suit for the mineral rights under the land in question.

"12. On November 10, 1919, J. I. Staley and the Martin heirs and their successors in title, filed suit in the 30th District Court of Wichita County, Texas, against J. L. Schnackenberg and a number of oil and gas lessees holding under the said J. L. Schnackenberg in trespass to try title, alleging that plaintiffs were the owners of a certain one-half interest in the mineral right, including the oil and gas on the entire one hundred sixty (160) acres described in plaintiffs' petition in this suit. Said plaintiffs further alleged that the defendants including defendant J. L. Schnackenberg have failed and refused to recognize the plaintiffs interest in said tract of land, and that the defendants on or about the first day of July 1919 ejected the said plaintiffs from said premises and disavowed said plaintiffs having any interest in said land and minerals thereunder. Said cause was dismissed by the plaintiffs on November 7, 1921.

"Upon the discovery of oil by the said J. I. Staley the defendant Schnackenberg notified The Texas Company, whose pipe lines were connected with said Staley well, that said Schnackenberg owned and was entitled to all the royalty oil from said well and demanded that the proceeds from the oil run from said well be paid to defendant, Schnackenberg and later agreed with the said Texas Company that proceeds from the sale of one-half of the royalty oil be withheld by the said Texas Company pending the result of litigation as to the title to said lands and the minerals thereunder, including the oil and gas.

"Thereafter The Texas Company having accepted a bond from the bank at Ralls, Texas, and the plaintiffs in this suit, paid over the proceeds of one-half the royalty oil to the said bank at Ralls, Texas, which with the accrued interest amounted to the sum of $1,963.23, on November 12, 1931, said sum is now held by said bank as stakeholder.

"14. This suit was filed on the 31st day of October, 1933.

"15. Since the year 1902 all taxes levied and assessed against that part of the one hundred sixty (160) acres of land not disclaimed by Schnackenberg have been paid before the same became delinquent by the said J. L. Schnackenberg and his predecessor in title, George P. Holtzen.

"16. About the year 1901 oil and gas was discovered near Petrolia, in Clay County, Texas, and about the year 1911 near Electra, in Wichita County, Texas, and about the year 1914 near Burkburnett in Wichita County, Texas, and about the year 1918 oil was discovered in the townsite of Burkburnett in Wichita County, Texas, and about the year 1920 oil was discovered and produced in the territory immediately surrounding the land in controversy.

"The title and possession of the land in controversy was the subject of numerous suits, including a suit by the State of Texas, at Austin, Texas, and a suit before the Supreme Court of the United States by the State of Oklahoma, in which case the United States intervened. The value of mineral rights including oil and gas in Wichita County, Texas, was generally and widely known throughout the State of Texas, Oklahoma and the entire United States.

"The adverse claim of defendant Schnackenberg against all the world to the premises in question, including the oil, gas and other minerals therein was open and notorious.

"Conclusions of Law.

"1. The deed from J. G. Eustis and W. G. Eustis, attorney in fact, to J. S. Martin is void, and was never ratified by J. G. Eustis or by anyone authorized by him to ratify same.

"2. Plaintiffs have no title, either legal or equitable to the lands and premises in controversy, including the oil and gas thereunder, and the proceeds of the royalty oil; but that all title thereto is vested in defendant J. L. Schnackenberg.

"3. The defendant J. L. Schnackenberg is a bona fide purchaser for value of the controverted lands and premises, including the oil, gas and other minerals therein and is entitled to the proceeds of the royalty oil in question.

"4. The plaintiffs are barred from recovery herein by the three, five and ten year statutes of limitation.

"5. That title to the lands, premises and mineral rights in question became vested in George P. Holtzen and through Holtzen

to defendant J. L. Schnackenberg by virtue of the judgment in the cause of George P. Holtzen vs. J. G. Eustis et al. No. 4050, in the District Court of Wichita County, Texas, and entered December 6, 1911.

"6. That any equitable claim to the lands in question or the minerals in question, including oil and gas, on the part of plaintiffs, has long since been barred by the statutes of limitation, by estoppel and by the principles of laches and stale demand.

"7. Under the agreements of all parties and the findings of fact and conclusions of law herein, I find and hold that the plaintiffs herein have no interest in the lands and premises or in any of the minerals therein and thereunder or the proceeds thereof, but that defendant J. L. Schnackenberg is the owner of the lands and premises in controversy and all the oil, gas and other minerals therein and thereunder, and the proceeds thereof, and is entitled to recover of the defendant, Security State Bank and Trust Company, the sum of $1,963.23 less the sum of $75.00 to be retained by said bank and trust company for attorneys fees and incidental expenses, and that the cloud be removed from the title of said J. L. Schnackenberg and that the said J. L. Schnackenberg be quieted in his title to said contested lands and premises, including all the oil, gas and other minerals therein and thereunder, and the proceeds thereof."

Following is the chain of title introduced by plaintiffs:

1. Patent from the state of Texas to F. W. Grassmeyer, assignee of F. W. Huseman, to 176 acres in Wichita county.

2. Deed from Grassmeyer to John T. Wyant to same land for $800 cash and subject to vendor's lien for $2,212.

3. An instrument in writing as follows:

"That I, J. G. Eustis of the County of Philadelphia, State of Pennsylvania, by my attorney in fact, W. G. Eustis, of the County of Clay and State of Texas, for and in consideration of the sum of One Dollar to me in hand paid by J. S. Martin, have granted, sold and conveyed, and by these presents do grant, sell and convey unto the said J. S. Martin of the County of Clay and State of Texas, all of my right, title and interest in and to an undivided half of one hundred and sixty acres of land in Wichita County, on Red River, about eleven miles above the mouth of Gilbert Creek, and of a Survey of one-third of a League located by virtue of Cert. No. 10, issued to F. M. Huseman:

"Beginning at the northwest corner of said Huseman Sur.

"Thence north 64 east 528 varas.

"Thence south 216 vrs.

"Thence west 475 vrs. to west boundary of said Huseman Sur.

"Thence north 1784 vrs. to the place of beginning, containing One Hundred and Sixty acres of land, the object of this deed being to convey and undivided half of my right, title and interest in the above described one hundred and sixty acres of land.

"To have and to hold with all the rights, etc., forever.

"Covenants to warrant and forever defend said premises against every person whomsoever lawfully claiming or to claim the same or any part thereof, through, by or under me.

"Witness my hand at Henrietta, this 4 day of June, 1881.

"J. G. Eustis, by his Atty.
"W. G. Eustis.

"The State of Texas, County of Clay:

"Before me, L. C. Barrett, a notary public in and for Clay County, Texas, on this day personally appeared W. G. Eustis, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

"Given under my hand and seal of office, this 6th day of June A. D. 1881.

"L. C. Barrett,
"Notary Public, Clay County, Texas."

4. Agreement of parties that plaintiffs are the sole heirs of J. S. Martin, deceased.

5. Oil and gas lease executed by plaintiffs as lessors to J. I. Staley, lessee, covering an undivided half interest in the 160 acres described in the purported deed from J. G. Eustis to J. S. Martin, copied above, dated May 5, 1919. All the foregoing instruments were duly acknowledged and recorded in the deed records of Wichita county.

6. Exhibit to answer of defendant bank showing the amount and value of the royalty produced from the property described in the purported deed from J. G. Eustis to J. S. Martin, with interest ac-

cumulated thereon, which royalty is held by the bank to await the judgment in this case; said royalty representing $\frac{1}{16}$ or one-half of the entire royalty, the other one-half being in Schnackenberg.

7. Surrender by Corsicana Petroleum Company of oil and gas lease to George P. Holtzen, said release being dated August 18, 1913, filed for record October 1, 1913, and recorded in volume 65, page 584, Deed Records of Wichita county, Tex.

9. Deed dated March 19, 1884, J. S. Martin to J. W. Dobkins and J. M. Culp to undivided one-half interest in 160-acre tract in controversy, reserving all minerals on said land and the right to mine for the same. Duly filed and recorded.

10. Deed dated June 23, 1884, from J. M. Culp to John W. Dobkins to 1,476 acres, Huseman survey, except undivided half interest in 100 acres out of northwest corner, also undivided half interest in 160 acres out of northwest corner and being same land conveyed to Culp and Dobkins on May 8, 1883, by W. G. Eustis, attorney in fact for J. G. Eustis. This instrument was also introduced by Schnackenberg as shown above as deed No. 3 in his chain of title, and was duly filed for record.

11. Deed dated October 12, 1893, J. S. Martin to J. R. Ralls, all mineral rights in 160-acre tract reserved in deed from J. S. Martin to Culp and Dobkins.

12. Deed, dated July 4, 1902, J. R. Ralls to J. S. Martin covering property described in last above deed. The three deeds last mentioned were likewise duly filed and recorded.

Following are instruments introduced in evidence by defendant J. L. Schnackenberg:

1. Power of attorney, executed by J. G. Eustis to W. G. Eustis, dated September 4, 1882, filed for record December 18, 1882, in records of deeds of Wichita county. Appointing W. G. Eustis attorney in fact with power "to sell and convey to any person or persons on such terms and for such consideration as he may deem proper the whole or any part of any land that I now have or may hereafter acquire in the State of Texas," with further power to execute conveyances to the property so sold, all in the name of J. G. Eustis. That instrument was duly acknowledged and recorded. But that instrument was introduced by defendant "for the purpose of discrediting the purported deed of J. G. Eustis to W. G. Eustis, attorney in fact, to J. S. Martin, of date June 4, 1881, as an ancient instrument only."

2. Warranty deed from J. G. Eustis by W. G. Eustis, attorney in fact, to J. M. Culp and J. W. Dobkins to the ⅓ of a league, or 1,476 acres located by virtue of certificate No. 10, issued to F. W. Huseman, but excepting from the conveyance "an undivided half interest in one hundred and sixty acres out of the northwest corner of said survey," describing by metes and bounds the same as in the purported deed from J. G. Eustis to J. S. Martin, of date June 4, 1881. But this instrument contains no stipulation of ratification of the former deed to J. S. Martin.

3. Warranty deed from J. M. Culp to John W. Dobkins 1,476 acres by virtue of certificate No. 10 issued to F. W. Huseman except 100 acres out of northwest corner and being same land conveyed to Culp and Dobkins by deed above noted. Also 160 acres out of northwest corner of same survey described by metes and bounds same as deed to J. S. Martin "of which one-half is herein conveyed and being same land that was conveyed to Culp and Dobkins" by deed noted above. Dated June 23, 1884.

4. Power of attorney from J. W. Dobkins to E. F. Bunch authorizing sale of all grantors' interest in Huseman survey. Dated October 9, 1885.

5. Warranty deed from John W. Dobkins by E. F. Bunch, attorney in fact to Herman Specht, to entire Huseman survey of 1,476 acres, but, "excepting, however, the mineral reservation of 81 acres sold by J. S. Martin, abstract number being 93." Dated August 6, 1885.

6. Warranty deed from John W. Dobkins by Bunch, attorney in fact to Herman Specht, ratifying last above deed. Dated August 1, 1891.

7. Warranty deed from Herman Specht to A. A. Morgan and J. W. Morgan to entire survey of 1,476 acres without any reservation. Date November 16, 1892.

8. Corrected warranty deed from Specht to A. A. Morgan and J. W. Morgan to same land without reservations of mineral rights. Date September 5, 1910.

9. Judgment in boundary suit of A. A. Morgan et al. v. C. Birk, in which none of plaintiffs were parties, being boundaries

as between plaintiffs and Birk. Dated November 11, 1899.

10. Warranty deed from A. A. Morgan to J. W. Morgan land in controversy. Dated December 10, 1900.

11. Warranty deed from J. W. Morgan to George Holtzen to land in controversy —without mineral reservations. Date August 10, 1901.

12. Judgment in favor of George Holtzen against Mrs. Pamela Baylor Tyler Eustis, surviving wife and sole legatee of J. G. Eustis, deceased, to 298 acres out of northwest corner of Huseman survey, which would embrace land in controversy, but plaintiffs in this suit not parties to that suit. Date December 6, 1911.

13. Plaintiffs' original petition in that suit, filed February 18, 1911, also amended petition filed April 8, 1911, alleging ouster of plaintiffs' possession by defendant on February 1, 1911, also alleging prior peaceable possession by plaintiffs. But plaintiffs in this suit not parties to that suit.

14. Warranty deed from Holtzen to J. L. Schnackenberg to land in controversy with no reservations. Date September 19, 1914.

All foregoing deeds offered by defendant Schnackenberg were for valuable consideration paid.

15. Oil and gas lease from George P. Holtzen to Corsicana Petroleum Company covering land in controversy. Dated June 23, 1911. But this lease was surrendered to lessor by the lessee on August 18, 1913.

16. Lease for copper and all other minerals except oil and gas, by J. L. Schnackenberg to Rosenberg and Montgomery, covering all land in controversy. Date February 14, 1917.

17. Oil and gas lease from J. L. Schnackenberg to Dr. J. R. McGee to land in controversy. Date November 6, 1918.

18. Assignment of that lease by McGee to Lee Tidwell. Date April 17, 1919.

19. Plat of subdivision including part of leases in controversy, by Lee Tidwell, and oil in controversy produced on lot 7, block 3, of that subdivision.

20. Original petition filed in district court of Wichita county by J. I. Staley and plaintiffs in this suit against J. L. Schnackenberg and others in trespass to try title to an undivided one half of the mineral rights, including oil and gas, in 160 acres, in northwest corner of Huseman survey, alleging ouster of plaintiffs' possession by defendants, July 1, 1919. Date of filing November 10, 1919. But that suit was later dismissed. Said defendant also introduced division orders addressed to the Texas Company covering royalties accruing from the 160 acres in controversy and correspondence relating thereto; but it is not necessary to list the same here, since they have no material bearing on the issue of title to be here determined.

W. G. Eustis was introduced as a witness upon the trial. According to his testimony, he moved to Texas from Philadelphia in 1872 and between the years 1877 and 1885 he bought and sold lands in Archer, Wichita, and Clay counties; his brother was J. G. Eustis, who lived in Philadelphia; he bought and sold lands for his brother, sometimes taking title in his brother's name and other times in the name of witness; his brother was never in Texas except for a few days on two or three visits; some of the land bought in the name of his brother was paid for with his brother's funds, some out of funds belonging to witness, and others with funds belonging to both; witness bought the 1,476 acres of the Huseman survey in Wichita county in the name of John T. Wyant and then had Wyant convey it to J. G. Eustis. J. G. Eustis may have known of this purchase and may not have known of it. Witness could not say whether the cash consideration recited in that deed to Wyant was paid out of funds belonging to J. G. Eustis or to the witness or to both.

"Q. He left the matter entirely to you about buying and selling this land? A. Yes.

"Q. He never directed you when to sell or when to buy? A. No, he just made me this power of attorney." (Referring to the power of attorney executed on December 18, 1882, which was more than one year after the date of the deed to J. S. Martin.)

He further testified that the reason he executed the deed to J. S. Martin for his brother was because of his contract with Martin so to do, in consideration of being shown the land by Martin, who thought there was copper on it. So far as witness could say, his brother never knew anything about this conveyance to Martin.

"Q. Did he ever object to anything you did in buying and selling land for him in Texas? A. No, he never made any objec-

**268**

tions that I know of; he had no reason to make any that I know of.

"Q. He always left all these matters up to you? A. Yes."

Witness testified that he sold the balance of the Huseman survey for the benefit of his brother and himself.

"Q. You got whatever profit there was in it, didn't you? A. Yes, half the profit, whatever it was; that is what I got and he got the interest on his money besides. In other words, all the land sold that was in his name I was supposed to get half the profits and he was to get half the profits; we understood the basis of our business; we divided the profits, in other words."

After the conveyance to Martin witness did not claim any interest in the land conveyed by that instrument for his brother and witness acted as attorney for his brother for many years after that transaction. His brother left his entire land transactions of purchase and sale in Texas to witness.

The $2,212 note recited in the deed from Grassmeyer to Wyant was later paid off by witness, but he could not say whether that was done with money belonging to J. G. Eustis or to both him and witness.

Witness further testified: "I figured he was buying the land and I was not buying it. He was buying because it was his money. Like other pieces I would where he furnished the money I would put it in his name because it was his land; then I expected to sell the land for a profit and make a profit on it."

The testimony of W. G. Eustis was not controverted by that of any other witness; and it conclusively shows that he had a partnership interest with J. G. Eustis in the 160 acres in controversy at the time he executed the deed thereto to J. S. Martin on the 4th day of June, 1881, and as between him and J. G. Eustis he had authority as such partner to convey to J. S. Martin full title to the property described in that. deed without any written power of attorney authorizing the same. 22 Tex. Jur. § 40, p. 282, § 41, p. 285; Cothran v. Marmaduke & Brown, 60 Tex. 370; Kelley, etc., Co. v. Masterson, 100 Tex. 38, 93 S.W. 427.

■ That being true, we believe the court erred in holding that the deed just mentioned was absolutely void for lack of authority in writing from J. G. Eustis to W. G. Eustis to execute it. And since the lack of such written authority was conclusively established by the testimony of W. G. Eustis himself, there was no basis for indulging a presumption to the contrary, under the rule announced in such decisions as *Baldwin v. Goldfrank*, 88 Tex. 249, 31 S.W. 1064; Garner v. Lasker, 71 Tex. 431, 9 S.W. 332. "Presumptions are indulged only to supply facts, and do not arise where the facts are known." 22 C.J., p. 83; 17 Tex.Jur. p. 244.

■ The purported deed from J. G. Eustis to J. S. Martin did not recite an assumption by Martin of the outstanding vendor's lien note for $2,212 recited in the prior deed from Wyant to J. G. Eustis. Even if it had done so, it could not now be said after more than fifty years have passed that his failure to pay the same would destroy the title, if any, which the deed purported to convey. And the same can be said of Martin's parol promise to assume that indebtedness if the testimony of W. G. Eustis could be so interpreted, which, to say the least, is doubtful. If such an agreement was made, its discharge is now conclusively presumed under article 5521, Rev.Civ. Statutes. Further still, according to testimony of W. G. Eustis, he executed the deed to Martin in fulfillment of his written agreement so to do in consideration of information furnished by Martin that the Huseman one-third league survey had valuable minerals on it.

■ Although the purported deed to J. S. Martin was insufficient to convey the legal title of J. G. Eustis to the land which it purported to convey, in the absence of a written power of attorney from him to W. G. Eustis conferring that authority, yet, in connection with the testimony of W. G. Eustis, it was valid and effectual as a contract upon which a conveyance of legal title might have been enforced against J. G. Eustis and subsequent purchasers chargeable with notice of the prior equitable title of J. S. Martin. Article 1301, Rev.Civ. Statutes; 14 Tex.Jur. § 10, p. 759. Nor was a power of attorney from J. G. Eustis to W. G. Eustis necessary to authorize the execution of the deed in order to give it effect as such a contract. 20 Tex.Jur. p. 265; 2 Tex.Jur., § 15, p. 396.

■ And while this was not a suit for specific performance of that contract evidenced by the deed, nevertheless the deed in connection with the testimony of W.

G. Eustis was admissible in evidence as tending to show an equitable title in J. S. Martin and his heirs. Gilmore v. O'Neil, 107 Tex. 18, 173 S.W. 203.

██ As shown above, the chain of title relied on by Schnackenberg began with the deed from J. G. Eustis by W. G. Eustis as attorney in fact to J. M. Culp and J. W. Dobkins, dated May 8, 1883, which was nearly two years subsequent to the purported deed to J. S. Martin, and ending with the deed from George P. Holtzen to J. L. Schnackenberg, dated September 19, 1914. Those deeds were by successive grantees following the original deed from J. G. Eustis to Culp and Dobkins, but George P. Holtzen, one of the claimants of title in that chain of deeds, also claimed title under a judgment in his favor for title to a part of the Huseman survey which included the 160 acres in controversy as against Mrs. Parmalee Baylor Eustis, widow and sole devisee of J. G. Eustis, deceased. J. G. Eustis died during the year 1910, and the judgment was rendered December 6, 1911. But neither plaintiffs nor any one through whom they claim title were parties to that suit, and therefore were not concluded by that judgment. And it may be noted here that if J. S. Martin acquired the equitable title to the land sued for under the purported deed to him, then no title was vested in Eustis at the time of his death, and therefore the judgment for such against his widow was of no legal effect against plaintiffs for that further reason. Peterman v. Harborth (Tex.Com.App.) 300 S.W. 33.

In some of the deeds in Schnackenberg's chain of deeds the 160-acre tract in controversy was expressly excepted from the conveyances. In others, some portions of the tract were excepted, while in others, including the one to Holtzen and the one from Holtzen to Schnackenberg, the whole tract was conveyed with no reservations or exceptions therefrom.

██ The general rule, undoubtedly, is that a purchaser of land is not chargeable with constructive notice of prior deeds or other evidences of title outside his chain of title, but he is chargeable with notice of recitals in his chain of deeds which tend to discredit title in the grantor. Davis v. Lund (Tex.Com.App.) 41 S.W. (2d) 57; 36 Tex.Jur. § 61, p. 498.

██ The actual knowledge of Schnackenberg, at the time he became a purchaser, of the purported deed of J. G. Eustis by W. G. Eustis, attorney in fact, coupled with the exceptions expressed in the chain of deeds through which he claimed title, was sufficient to excite inquiry by a person of ordinary prudence, of W. G. Eustis, then still residing in Henrietta, where he resided when the deed was executed, and which was in Clay county adjoining Wichita county, where the land was located, as to any equitable rights of J. E. Martin in the land which that deed purported to convey, and which inquiry would have disclosed the facts testified to by him on the trial of this case. And, under the authorities cited above, such facts tended to overcome Schnackenberg's defense of innocent purchaser without notice.

All deeds in Schnackenberg's chain of title were duly acknowledged and recorded in the records of deeds of Wichita county, where the land in controversy was situated. And the findings by the trial court that he and his predecessors in title have paid all taxes thereon since the year 1902 is unchallenged by appellants.

Under the doctrine of the decision in Elliott v. Nelson, 113 Tex. 62, 251 S.W. 501, by the Commission of Appeals, we do not believe that the deeds in Schnackenberg's chain of conveyances purporting to convey the entire title to the 160-acre tract, coupled with possession of the surface of the tract, or the execution of the oil lease by Schnackenberg and possession of the surface thereunder, were of themselves sufficient to establish adverse possession as against plaintiffs' claim of title to the minerals in the tract, within the meaning of the five years' statute of limitation. Articles 5509 and 5515, Rev.Civ. Statutes. Besides, the date of the oil lease executed by Schnackenberg was within the five years' period immediately preceding the suit by plaintiffs against him and the lessee to establish their right to the mineral interest in controversy.

The effect of our foregoing conclusions is to sustain some of appellants' assignments of error bearing upon controlling issues, by reason of which the judgment of the trial court will be reversed and the cause remanded for a new trial as between plaintiffs and defendant Schnackenberg and defendant Security State Bank & Trust Company, the stakeholder, but the judgment in favor of the Texas Company is affirmed. A determination of other

assignments addressed to the findings and conclusions of the trial court is unnecessary.

MARTIN, J., not sitting.

### On Motion for Rehearing.

DUNKLIN, Chief Justice.

Appellee Schnackenberg with much earnestness insists that we were in error in holding that the evidence conclusively showed that W. G. Eustis had a partnership interest with J. G. Eustis in the 160 acres in controversy at the time he executed the deed to J. S. Martin on the 4th day of June, 1881, and as between him and J. G. Eustis he had authority as such partner to convey to J. S. Martin equitable title to the property described in that deed without any written power of authority authorizing the same. The decision principally relied upon to support that attack is the case of Buzard v. First National Bank of Greenville, 67 Tex. 83, 2 S.W. 54, 60 Am.Rep. 7.

In that case it was held that the fact that Pennington was to receive one-half of the profits of the business for his services in the cattle business, for which Buzard furnished the capital, did not make him a partner, since the evidence showed that what Pennington was to receive was by way of a salary for services and not as a principal in the joint undertaking. The case was distinguished from opinions of the same court in Goode v. McCartney, 10 Tex. 193, and Cothran v. Marmaduke & Brown, 60 Tex. 370, by reason of that difference in the contract between the parties. And to show that difference, excerpts from the opinion in the Cothran Case were quoted in part as follows: "The true distinction is this: Where a clerk or agent by agreement is to receive a fixed portion of the profits as compensation for his time or labor, that he does this as clerk or agent and not as principal; for the partnership fund or effects may be legally used in paying such clerk or agent for his time and services."

In the case of Tinsley v. Dowell, 87 Tex. 23, 26 S.W. 946, cited in support of the motion, it was held that Dowell, a real estate broker with whom real estate had been listed for sale and who was to receive 2½ per cent. commission on the amount realized by the sale for a price fixed by the owner, and for all over and above the price so fixed which might be realized from the sale, could not recover from Tinsley who had failed to carry out his contract of purchase for what the broker would have realized had the sale been consummated; the conclusion reached by the court being as follows: "Dowell having shown only an interest in the proceeds of the sale not made, did not show an interest in the property, and could not recover against Tinsley."

Judge Brown, who wrote the opinion in that case, also wrote the opinion in Kelley Island Lime & Transport Co. v. Masterson, 100 Tex. 38, 93 S.W. 427, 430. In that case it appeared that Masterson furnished the capital to enable Downey and Kelley to carry out their contract with the city of Beaumont for certain public improvements. We quote from that opinion as follows:

"Downey and Kelley agreed to give their time and skill to the prosecution of the work, and, when all debts were settled and 8 per cent. interest paid to Masterson for the money furnished by him, the net profits, if any, were to be divided by first giving to Masterson $12,500, then to Downey and Kelley $25,000 if there should be so much profit on the contract. If the profits exceeded $37,500, then Downey and Kelley were to receive two-thirds of the excess. To state the facts leads to the conclusion that Masterson was a partner in that enterprise. Each of them participated in the net profits of the business, and neither of them received it for services rendered as the agent of the other.

"This case is distinguishable from Buzard v. Bank, 67 Tex. 83, 2 S.W. 54, 60 Am.Rep. 7, in these respects: Buzard employed Pennington and furnished him with money to buy cattle, and, for his services, Pennington was to receive a part of the profits of the business. Pennington was distinctly an agent of Buzard. Masterson put his credit and money into the Beaumont contracts against the skill and services of Downey and Kelley, who proceeded as contractors with Beaumont to construct the work. Downey and Kelley were under no obligation to repay to Masterson the money advanced by him. Masterson took the chances on success for the return of his money and interest thereon. Downey and Kelley were to receive each $100 per month as advances, to be deducted from their share of the profits. Masterson was not to receive his share of the

profits as compensation for the use of his money, nor were Downey and Kelley to receive their share as payment for services; but each received the profits as fruits of the joint enterprise—that is, as profits —which made them partners."

Quoting further from the first portion of the opinion in that case: " 'If one person advances funds, and another furnishes his personal services and skill in carrying on the business and is to share in the profits, it amounts to a partnership. It would be a valid partnership, notwithstanding the whole capital was in the first instance advanced by one partner, if the other contributed his time and skill to the business, and although his proportion of gain and loss was to be very unequal. It is sufficient that his interest in the profits be not intended as a mere substitute for a commission, or in lieu of brokerage, and that he be received into the association as a merchant and not an agent.' Goode v. McCartney, 10 Tex. 193; Ball v. Britton, 58 Tex. 57."

The case of Frank v. Gaffney (Tex. Civ.App.) 2 S.W.(2d) 885, 887, is also cited in support of the motion. In that case it appeared that Frank and the defendant Gaffney entered into a contract for the purpose of buying and selling certain real estate in the city of Houston. Gaffney was to furnish the money necessary to make the purchase, the title to be taken in his name. It was agreed that one-half of the property was to be held by Gaffney in trust for the plaintiff Frank. It was further alleged that after the property was purchased it was subdivided into lots and through the efforts of Frank certain portions were sold and the proceeds of such sale were turned over to the defendant. The case was brought upon the theory that the property so acquired in the name of Gaffney and the proceeds arising therefrom were impressed with a trust in plaintiff's favor. Upon that theory the decision was in Frank's favor for one-half the net proceeds realized from the sales so made. In the opinion the following was said: "While it is true, as contended by appellee, that, where one buys land, and agrees that another shall sell it, the compensation of the latter to be derived from a share of the profits, such agreement does not constitute a partnership, yet it is equally true that, when there has been a partial or full performance of the agreement by one party in such case, and as in the pres-

ent case, such performance operates as a sufficient consideration, and renders the contract binding upon the other party."

However, the statement so made in the opinion, to the effect that the agreement in that case did not constitute a partnership, was foreign to the theory upon which the suit was instituted. It was a mere passing reference and without citation of any authority to support it, and for that reason the case is distinguishable from the present suit.

The undisputed testimony of W. G. Eustis showed a joint undertaking on the part of himself and his brother J. G. Eustis to buy and sell land in Texas, and that W. G. Eustis was to share in the profits from those transactions, not as a salary for his services, but as one of the principals in the joint enterprise, and therefore we adhere to the conclusion expressed in our opinion upon that issue. In further support of this conclusion, we quote the following from 20 R.C.L. § 66, p. 859: "Where real estate is acquired in partnership business, and for its purposes, it is partnership assets, though the legal title be taken in the name of one of the partners." See, also, same volume, §§ 38, 39, p. 834; § 62, p. 855; §§ 71, 72, p. 862.

We quote the following from 20 Tex. Jur., § 85, p. 293: "The statute of frauds does not affect an agreement to share profits arising from the purchase and sale of real estate. Nor does it apply to a contract for the acquisition of property by the parties jointly or an agreement to pay a proportional part of the moneys expended in the purchase of real estate."

The conclusion we reached that the evidence showed a partnership between W. G. and J. G. Eustis was for the purpose of showing authority in W. G. Eustis to bind J. G. Eustis by the deed executed to Martin. But even though it could be said that such a partnership was not effected by the agreement, still the evidence shows conclusively oral authority from J. G. Eustis to W. G. Eustis to buy and sell the land in controversy, by virtue of which an equitable title was in fact conveyed to Martin by the deed in his favor, referred to above. 20 R.C.L. § 118, p. 906; Frost v. Wolf, 77 Tex. 455, 14 S.W. 440, 19 Am.St. Rep. 761.

[13] And since the evidence upon the issue of agency was undisputed, the force to be given to it was a question of law,

available to appellants in the absence of any specific finding by the trial court on that issue or any request for such a finding. Electric Express & Baggage Co. v. Ablon, 110 Tex. 235, 218 S.W. 1030.

If under article 5521, Rev.Civ. Statutes, it must be conclusively presumed that Martin later paid any consideration he might have owed for the land deeded to him, then any testimony to a contrary effect would be incompetent. And therefore the authorities cited in support of the contention that a specific performance of the contract evidenced by the deed to Martin could not be decreed in the absence of proof of payment of the full consideration are not in point.

Without reviewing the evidence at length, we adhere to the conclusion reached that the evidence was insufficient to show that either Schnackenberg or any person through whom he claimed title held adverse possession of the interests of plaintiff in the land in controversy for a sufficient length of time to sustain the defense of the five years' statute of limitation. And we will add that we do not believe that the petition in trespass to try title in a former suit, later dismissed, noted in the trial court's findings, was admissible in evidence as an admission against interest to support that defense. That petition was in the form prescribed by the statutes for recovery of title to real estate or to remove a cloud on the title of plaintiff even if he is already in possession.

For the reasons stated, the motion for rehearing is overruled.

MARTIN, J., not sitting.